UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. NO. 03-30309-MAP

SHARI LITTLEWOOD,

       Plaintiff,

v.

MICHAEL J. RACICOT, Former Town
Administrator for the TOWN OF ORANGE
and THE TOWN OF ORANGE,

       Defendants

AFFIDAVIT OF JACKIE COWIN

I, JACKIE COWIN, under oath do hereby depose and state as follows:

1.    I am licensed to practice law in the Commonwealth of Massachusetts and in the United States District Court for the District of Massachusetts, and am an associate at the law firm of Kopelman and Paige, P.C.

2.    I was involved in preparing the Defendants' Motion for Summary Judgment in the above-captioned case.

3.    Each of the deposition excerpts attached as Exhibits to this affidavit are true and accurate copies of pages from the transcript of the referenced deposition.

Signed under the pains and penalties of perjury this 31st day of January, 2005.

242215/METG/0516

_Jackie Cowin_
Jackie Cowin

SHARI LITTLEWOOD

VS.

MICHAEL J. RACICOT, ET AL


UNITED STATES DISTRICT COURT


DEPOSITION OF SHARI LITTLEWOOD


JULY 22, 2004



MINI TRANSCRIPT AND WORD INDEX



LEAVITT REPORTING, INC.

1207 COMMERCIAL STREET

WEYMOUTH, MA 02189

(617)335-6791   1-800-464-1877

FAX (617)335-7911

29

1   clients then, your own personal clients?

2       A.   Yes.

3       Q.   In your position as an assessor for the Town of

4   Orange, do you receive any compensation?

5       A.   Yes.

6       Q.   Is it a stipend?

7       A.   Yes.

8       Q.   Is it $3,000 a year?

9       A.   Yes.

10      Q.   Has it been that throughout your tenure?

11      A.   Yes.

12      Q.   For a certain period of time in the position

13  that brings us here, did you also work as the clerk to

14  the board of assessors?

15      A.   Yes.

16      Q.   And what was the tenure of your employment as

17  clerk?

18      A.   May, 1999 to October of 2001.

19      Q.   Were you paid $10.75 per hour?

20      A.   Yes.  I need to make a correction.  While I was

21  working as the clerk, I did not get paid the stipend for

22  the assessor's position.

23      Q.   You didn't get them both at the same time?

30

1       A.   No.

2       Q.   You mentioned the Littlewood-Carey Business

3   Services as your business.  Correct?

4       A.   Yes.

5       Q.   Did you provide any type of service apart from

6   tax preparation in that regard?

7       A.   Yes.

8       Q.   What other types of services do you provide?

9       A.   The tax preparation, the apartment manager,

10  loan processing.

11      Q.   Have you also worked as a mortgage loan

12  processor?

13      A.   Yes.

14      Q.   What is a mortgage loan processor?

15      A.   Mortgage loan processor basically processes the

16  loan once the initial application has been taken by the

17  loan officer, and the loan officer collects all the

18  information, gives it to me, and from that point I get it

19  to close.

20      Q.   Are you employed by any mortgage company or

21  bank?

22      A.   No.

23      Q.   Are you an independent contractor to any

31

1   mortgage company or bank?

2       A.   Yes.

3       Q.   Is there a particular mortgage company or bank

4   that provides you with all your work as a mortgage loan

5   officer?

6       A.   Yes.

7       Q.   Which is that?

8       A.   Nova Star Mortgage.

9       Q.   Where are they located?

10      A.   Athol, Mass.

11      Q.   Have you worked for them since October, 2001?

12      A.   Yes.

13      Q.   How much do you make in that position?

14      A.   Six hundred a week.

15      Q.   Is that an average or is that a fixed amount

16  that you get every week?

17      A.   That's a fixed.

18      Q.   Is that an amount you would receive regardless

19  of how many loans you process in that week?

20      A.   Yes.

21      Q.   Have we now reviewed all your employment since

22  high school?

23      A.   Yes.

32

1       Q.   Now, are you an Orange native?

2       A.   Yes.

3       Q.   At what point did you determine to run for the

4   position of assessor in the town as opposed to when you

5   first campaigned?  When did you first decide to do that?

6       A.   It was the summer prior to the elections.

7       Q.   What led you to run?

8       A.   Well, the assessor's position was kind of the

9   same thing that I was dealing with with taxes, and

10  because I would see the real estate taxes, I would have

11  to deal with the tax collector office and stuff for

12  different things, so.

13      Q.   Did any then sitting member of the assessors

14  encourage you to run?

15      A.   No.

16      Q.   Did you consult with any then sitting member or

17  former member of the Orange board of assessors before you

18  ran?

19      A.   No.

20      Q.   Were you successful in your first campaign?

21      A.   Yes.

22      Q.   How many assessors during your tenure are there

23  in Orange at one time?

33

1    A.    Three.

2    Q.    And is one of the assessor positions up for

3    election each year?

4    A.    Yes.

5    Q.    During your tenure has there always been a

6    chair of the board of assessors?

7    A.    Yes.

8    Q.    How is the chair determined at any given time?

9    A.    It's voted on when a new assessor comes in.

10    Q.    Have you ever been chair?

11    A.    No.

12    Q.    During your tenure would you tell me all of the

13    other members of the board of assessors with whom you

14    have served?

15    A.    Norman Bartlett, Stephen Adam, Laurie Kaltner,

16    Jay Closser.

17    Q.    How do you spell Closser?

18    A.    C L O S S E R.

19    Q.    Are those the only assessors with whom you

20    served?

21    A.    Ron Hurlbert.  He was a fill-in.

22    Q.    H U R L B E R T?

23    A.    Yes.

34

1    Q.    Anyone else?

2    A.    Richard Hall.

3    Q.    Does that complete your answer?

4    A.    Yes.

5    Q.    During your tenure has there always been only

6    one chair?

7    A.    Yes.

8    Q.    Who has that been?

9    A.    Norman Bartlett.

10    Q.    Apart from your --

11    A.    If I could just add.  The reason why I never

12    was a chair was that at some point in time I was in the

13    clerk's position, and I couldn't really be a chair and be

14    in the clerk's position, too.  So that's why I was never

15    a chair.

16    Q.    Why did you -- Did someone tell you you

17    couldn't serve as clerk and chair?

18    A.    Well, it doesn't look good.  I would be the

19    boss of, my own boss.

20    Q.    I appreciate your response.  My specific

21    question was, did anyone tell you that?

22    A.    No.

23    Q.    Those were your own feelings?

35

1    A.    That was how the board felt.

2    Q.    Now, you have been an assessor since -- Strike

3    that.  After you no longer served as clerk, you have

4    served as an assessor.  Correct?

5    A.    Yes.

6    Q.    Have you ever run for chair during that latter

7    period?

8    A.    No.  Because when I left as clerk in October,

9    my term didn't run out until March of the next year.

10    Q.    What about this present term, have you run for

11    chair?

12    A.    No.

13    Q.    What does Mr. Bartlett do for a living apart

14    from being assessor?

15    A.    He is, he does septic Title V's.

16    Q.    If you know, does he have any education in the

17    area of assessing beyond yours?

18    A.    Yes.

19    Q.    What is that?

20    A.    His wife owns a real estate business, and he

21    does real estate, too.  He used to do it.

22    Q.    Would he do listings and the like?

23    A.    Yep.

36

1    Q.    How long has Mr. Bartlett served as the Orange

2    chair of the board of assessors?

3    A.    He went in a year ahead of me.

4    Q.    Would that be 1998?

5    A.    Yes.  I don't think he was the chair then.  We

6    had an assessor leave, Richard Hall left, and then that's

7    when we had to, we were told we needed to vote for a new

8    chair, and that's when he was voted in.

9    Q.    When was that, as best you can recall?

10    A.    As best as I can recall, sometime in '99.

11    Q.    Who sat with you on the board of assessors in

12    1999?

13    A.    Well, Richard Hall was there.  He left, and

14    then Ron Hurlbert was appointed to his position to finish

15    his term.  Norman Bartlett.

16    Q.    Did you serve as an assessor prior to serving

17    as clerk?

18    A.    Yes.

19    Q.    During that period did you have any interaction

20    with the town manager or town administrator concerning

21    your duties as assessor?

22    A.    No.

23    Q.    Did you ever have any meetings or discussions

37

39

1  with the board of selectmen concerning your position as
2  assessor?
3     A.  No.
4     Q.  In 1999 was Robert Andrews the town
5  administrator?
6     A.  Yes.
7     Q.  Now, at some point -- Strike that.  When you
8  first became an assessor, was there a clerk --
9     A.  Yes.
10    Q.  -- to the board?
11    A.  Yes.
12    Q.  Who was that?
13    A.  It was Anne.  I can't recall her last name.
14    Q.  Did she leave that job?
15    A.  Yes.
16    Q.  Do you know why?
17    A.  No, I don't.
18    Q.  Did you apply in some fashion for the vacancy?
19    A.  I started out by filling in, and then it was
20 checked with ethics to see if I could actually apply, and
21 we, I went through the application process like everybody
22 else did, and there were certain stipulations which we
23 had done.

1  had been done previously in the past, is appointed by the
2  board of selectmen.
3     Q.  So at the time that you were appointed clerk to
4  the board of assessors, am I correct in understanding
5  that your open appointment came from the board of
6  selectmen?
7     A.  Right.  It was an ethical conflict for the
8  board of assessors to appoint me and also be on the board
9  itself, so it had to be the board of selectmen then
10 appointed me.
11    Q.  Do you know traditionally whether the
12 appointments to the clerk position prior to your
13 appointment had always been by the board of selectmen?
14    A.  The final appointment.  But, as far as picking
15 out who the employee was, the board of assessors did
16 that.
17    Q.  With respect to your candidacy for clerk, did
18 the assessors weigh in or give an opinion or approval to
19 your hiring by the selectmen?
20    A.  No.
21    Q.  If you know.
22    A.  Well, Robert Andrews was a selectmen at the
23 time.  So he was in on the whole thing, too, just because

38

40

1     Q.  All right.  First of all, I trust that you got
2  an approval or a clearance from the ethics commission
3  before you applied.  Is that correct?
4     A.  Yes.
5     Q.  Was that a written approval?
6     A.  No.
7     Q.  Was it something someone told you verbally?
8     A.  Well, what you can do is call the ethics
9  commission and say this is what is going on, is it
10 ethical, is there something we should do.
11    Q.  Do you remember to whom you spoke?
12    A.  I didn't speak to anybody.  Robert Andrews was
13 the one that called them.
14    Q.  Did you speak with Mr. Andrews about the
15 potential for becoming clerk before you approached the
16 ethics commission on that issue?
17    A.  Yes.
18    Q.  And why was it that you discussed that position
19 with Mr. Andrews?
20    A.  Because he was the one that was there at the
21 time because the town was looking for a temporary person
22 to do that, and the only ones that could appoint that
23 position was the board of selectmen.  And that's how it

1  to make it impartial.
2     Q.  During what years was Andrews a selectmen?
3     A.  I don't recall.
4     Q.  When did he become town administrator, if you
5  know?
6     A.  When the other one left.
7     Q.  When was that?  Do you know?
8     A.  No, I don't.  Because she was gone when I got
9  elected.
10    Q.  In any event, Andrews was town administrator
11 when you first became clerk.  Is that right?
12    A.  Well, he was taking over that position.
13    Q.  Now, you said first you filled in at the
14 position of clerk.  Correct?
15    A.  Right.
16    Q.  As a foundational matter, during the time that
17 you served as assessor's clerk, did the duties change?
18    A.  No.
19    Q.  Since that period, to your observation as an
20 assessor, have the duties of the clerk's position
21 changed?
22    A.  No.
23    Q.  What are the duties of the clerk to the board

43

of assessors in Orange?

A.    The duties are to maintain the phones, customer service, making sure that records are correct. Sometimes listening to people from different departments.

Q.    I'm just making notes. You go ahead. Anything further?

A.    Just clerical that the board isn't there to do.

Q.    Did you fill in as clerk to the board of assessors prior to a formal appointment to that position?

A.    Yes.

Q.    For how long a period of time?

A.    About two and-a-half months, three months.

Q.    Were you compensated for your efforts in that regard?

A.    Yes, I was.

Q.    Do you know how that could be before a formal hiring? Do you know what the mechanism was?

A.    I don't remember.

Q.    Were you paid on a Town of Orange check?

A.    Yes.

Q.    Now, I'm going to show you a document that I'm going to ask be marked as Exhibit 1. Would you look it over? When you're done, we'll talk about it.

42

(Document marked Exhibit No. 1 for Id.)

Q.    Have you looked over what we have marked as Exhibit 1?

A.    Yes.

Q.    Have you ever seen it before?

A.    Yes.

Q.    Were you copied on it, in fact?

A.    Yes.

Q.    Who is Doris Bittenbender?

A.    She is the town accountant.

Q.    Is she still the town accountant?

A.    No.

Q.    During what -- When did she last serve in that position?

A.    She retired. If I can recall right, I think 2001 she retired.

Q.    Who has her position now?

A.    Nan Reichlagher.

Q.    You ought to try to spell that, if you can.

A.    It's about this long.

Q.    Take your time.

A.    R E I C H L A G H E R.

Q.    Thank you. Is Exhibit 1 accurate in indicating

that your effective date of assignment or appointment to the position of assessors' clerk was June 20, 1999?

A.    Yes.

Q.    Initially was your rate of pay nine dollars per hour for a thirty-five hour workweek?

A.    Yes.

Q.    Were you provided with benefits beyond the monetary compensation at that point?

A.    Yes.

Q.    Did you get health care and the like?

A.    Yes. I think I had to wait for health care for a few months.

Q.    There's a reference in Exhibit 1 to the interview committee. Do you see that?

A.    Yep.

Q.    Is the interview committee a standing committee in the Town of Orange?

A.    No.

Q.    What does this mean as concerns your employment on Exhibit 1, if you know?

A.    What do you mean?

Q.    What was the interview committee as concerned your appointment?

44

A.    The interview committee was the assessors and Robert Andrews.

Q.    And there's a reference as well to the human resources board. Do you see that?

A.    Yes.

Q.    What is the human resources board in Orange?

A.    They're supposed to be, they're supposed to be taking care of any kind of personnel issues or guidelines and stuff like that.

Q.    To your knowledge, is the human resources board identified in the town charter or bylaws?

A.    I believe it is. It wasn't -- It was formed not too long ago.

Q.    It was in effect or in existence in 2001, was it not?

A.    Yes.

Q.    During that period who comprised the human resources board? Who sat on it?

A.    The chair was Joe Hawkins. I can see their faces. I don't remember what their names are.

Q.    We may have some documents that will help you with that later. In any event, please tell me again, I'm sorry if I missed it, what did you understand to be the

49

1    Q.   Are you the first one to have written the

2    description for clerk?

3    A.   Yes.

4    Q.   Why did you write a written job description?

5    A.   Because we needed it for the classification for

6    the jobs.

7    Q.   Classification in what sense?

8    A.   We were going through a classification process

9    basically to determine what each position in the town

10   does, as to what their compensation should be, and did a

11   comparable to other towns to see, you know, if we were in

12   the ball park, we weren't, what we need to change.

13   Q.   Did the job description, to your memory,

14   address the issue of supervision of the clerk's position?

15   A.   No.

16   Q.   Was there any reference in it as to whom the

17   supervisor of the clerk was?

18   A.   No.

19   Q.   Was there any reference in the written document

20   as to whom, if anyone --

21   A.   Well, it did say that the clerk answered to the

22   board of assessors.

23   Q.   In what regard, do you remember?  Was it more

50

1    specific than that?

2    A.   Basically in all regards.

3    Q.   Did the job description state who, if anyone,

4    would evaluate the clerk?

5    A.   No.

6    Q.   Not one way or the other.  Is that correct?

7    A.   Right.

8    Q.   When you --

9    A.   We never had evaluations.  That was something

10   new.

11   Q.   When you assumed the position, was Mr. Andrews

12   town administrator?

13   A.   Yes.

14   Q.   When did he leave?

15   A.   I don't recall.

16   Q.   Was he succeeded by Mr. Racicot?

17   A.   Yes.

18   Q.   He was still --

19   A.   He was still a selectmen, so he didn't leave.

20   Q.   He was in town, involved with town affairs?

21   A.   Yes.

22   Q.   What was your understanding from Mr. Andrews at

23   the time that you first became clerk as to whom you would

51

1    report in terms of supervision?

2    A.   My understanding was the board of assessors.

3    But because the board couldn't appoint me, the selectmen

4    did.  Because the understanding was that Bob Andrews knew

5    nothing about what I was supposed to be doing or what was

6    supposed to be going on in our office.  That's what my

7    understanding is.

8    Q.   Whose payroll were you on?

9    A.   Town of Orange.

10   Q.   What account?

11   A.   Assessors' clerk.

12   Q.   That was an assessor line item as opposed to a

13   selectmen line item?

14   A.   Yes.

15   Q.   During your tenure as clerk, did anyone ever

16   tell you that you were subject to the supervision of the

17   selectmen through the town administrator as well?

18   A.   No.  Not until I got my suspension letter.

19   Q.   Prior to that -- And that was in 2001.

20   Correct?

21   A.   Yes.

22   Q.   Prior to that, did you report in terms of

23   notification of your activities to the town

52

1    administrator?

2    A.   It was requested, yes.

3    Q.   By whom?

4    A.   By the town administrator.

5    Q.   Which one?

6    A.   Mike Racicot.

7    Q.   After he made that request, did you do so?

8    A.   Yes.

9    Q.   On what terms and conditions of your employment

10   did you report to him?

11   A.   If I was going to be out of the office, to let

12   him know because our office would be empty.

13   Q.   Anything else?

14   A.   Basically, that's.

15   Q.   Do you know if Mr. Racicot ever evaluated you?

16   A.   Yes, he did.

17   Q.   When did he do so?

18   A.   It was about December of '99.  It was

19   six months.  It was a six-month evaluation.

20   Q.   Was it a written evaluation?

21   A.   Yes.

22   Q.   Do you have a copy of it?

23   A.   Yes, I do.

65                                                          67

1    A.   Yes.

2    Q.   Which department ran that service?

3    A.   Fire department.

4    Q.   And what was the arrangement prior to this

5    proposal in terms of who collected the fees from insurers

6    or private people for the EMS and ambulance services?

7    A.   The fire department did.

8    Q.   What did the fire department do with the money

9    it received in that regard?

10   A.   It went into the general fund.

11   Q.   To your understanding, how would the proposal

12   with respect to the reserve account have changed that

13   arrangement?

14   A.   All the monies would no longer go into the

15   general fund, and it would go right into that reserve

16   account.

17   Q.   Is it your understanding and was it your

18   understanding that the reserve account process or format

19   establishes a self-sufficiency financially for the

20   particular department?

21   A.   Yes.

22   Q.   Meaning they live off their own receipts.  Is

23   that correct?

1    from to start the reserve account.  He just said we're

2    going to have a reserve account, the ambulance is going

3    to be self-sufficient, it's just going to be an

4    accounting issue.

5    Q.   When you say money being set aside, is that --

6    A.   It's money being taken away from our income,

7    being taken away from the town's income and being set

8    aside for a year.

9    Q.   Until the receipts of the ambulance kick in, is

10   that correct, was that your understanding?

11   A.   No.

12   Q.   I'll give you a better question.

13   A.   No.  They were going to take all the receipts

14   for a year, create this fund, and then they were always

15   going to be a year ahead of time in the reserves.

16   Q.   What does it mean to be a year ahead of time?

17   A.   Because they needed a certain amount to open up

18   the reserve fund to cover the budget for the fire

19   department.  So what they did is they took it out of the

20   general fund income, and they just took that lump sum and

21   we're going to put it over and hold on to it, so nobody

22   could use it.

23   Q.   When you're talk -- This is a concept known as

66                                                          68

1    A.   Yes.

2    Q.   But that was not the situation in September of

3    2000.  True?  There was no reserve fund for the ambulance

4    services?

5    A.   Right.

6    Q.   All right.  Now, how did you first learn of a

7    proposal to set up a reserve account for ambulance

8    services?

9    A.   It was -- He had come to one of our meetings

10   and also he had sent a memo.

11   Q.   "He" being Mr. Racicot?

12   A.   Yes.

13   Q.   And do you have a copy of his memo?

14   A.   I think I do.  At home.

15   Q.   On what date did Mr. Racicot appear before the

16   board of assessors in connection with this proposal?

17   A.   I don't recall.

18   Q.   Did he indicate that it was his brainchild, his

19   idea?

20   A.   Yes.

21   Q.   What exactly did he say, as best you can

22   recall, to the assessors about this proposal?

23   A.   He never explained where the money was coming

1    set aside.  Correct?

2    A.   Yeah.

3    Q.   Am I correct in understanding that at the

4    beginning of this reserve account the amount of monies

5    that had been contributed to the general fund from the

6    prior year's ambulance receipts would be taken from the

7    general fund and segregated to the reserve account?  Is

8    that correct?

9    A.   No.

10   Q.   Please correct me if I am wrong.

11   A.   The money from the prior year had already been

12   spent.  So what they were taking, what was going to be

13   taken was the income that was coming in currently, but it

14   was going to be one lump sum, and it was going to be

15   built into our tax rate.  It wasn't money that was

16   sitting there that could be taken.

17   Q.   I appreciate that.  Now, at some point in time

18   did you become aware of the amount that would be required

19   as the set aside for this account?

20   A.   Yes.

21   Q.   How did you learn the figure?

22   A.   Because it was in the memo, I believe.

23   Q.   Was this amount in excess of $160,000, if you

69

1  remember?

2      A.    I don't remember.

3      Q.    In any event, to your understanding, at the

4  time this account was created was it necessary to set

5  aside certain funds?

6      A.    Yes.

7      Q.    For what purpose?

8      A.    Because that's how you set up a reserve.

9      Q.    In this instance, what was that amount

10  contemplated to cover?  What was it intended for?

11      A.    The expenses of the ambulance.

12      Q.    Initially, as you understood it, with this

13  proposal where was that money coming from?

14      A.    The taxpayers money.  Out of the real estate

15  taxes.

16      Q.    Not from an existing general account line?

17      A.    Right.  There was no, there was no general

18  account line for that.

19      Q.    So certain monies derived from the taxpayers of

20  Orange, instead of going into the general account under

21  this proposal, it would go into the reserve account for

22  the ambulance services.  Is that correct?

23      A.    Right.

70

1      Q.    Okay.  When he appeared before the assessors,

2  did Mr. Racicot discuss this initial funding issue?

3      A.    No.  Not in detail.

4      Q.    Did he raise it at all?

5      A.    Not how he was going to get it.

6      Q.    Did anyone ask him how he was going to get it?

7      A.    No.  Because it was just an accounting issue.

8  What would the assessors have to do with an accounting

9  issue?

10      Q.    Did he present it to the assessors as a, quote

11  unquote, accounting issue?

12      A.    Yes.

13      Q.    Did anyone ask him what he meant by that?

14      A.    No.

15      Q.    How many times did Mr. Racicot appear before

16  the assessors with this proposal?

17      A.    Only once, I believe.  He went to all the

18  boards.  Wasn't just our specific.

19      Q.    What other boards do you know he went to?

20      A.    I don't know.  But it was just the general

21  informational type thing.

22      Q.    Now, on or about September 20th, 2000, to your

23  knowledge, was this proposal approved by the board of

71

1  selectmen?

2      A.    I believe it was.

3      Q.    And at the time of approval, do you know

4  whether anyone had yet raised the issue of where the

5  money was coming from?

6      A.    I don't believe so.

7      Q.    All right.  At some point did it become a

8  concern of yours?  End of question.

9      A.    Yes.  It did.

10      Q.    And what triggered that concern in your mind?

11      A.    Because when I got the paperwork for the recap

12  sheet, it showed where it was coming out and how much it

13  was going to raise our taxes.

14      Q.    Was your concern, to your knowledge, based on

15  what people may have said to you, a concern of other

16  assessors?

17      A.    Not at that point in time, no.

18      Q.    Do you believe you were the first one to see

19  this as an issue?

20      A.    Yes.

21      Q.    Did you first discuss it with the other

22  assessors?

23      A.    Yes.

72

1      Q.    Can you share with me the sum and substance of

2  that discussion?

3      A.    We went through the recap sheet, and we were

4  doing the tax rate, and we just went through.  I said,

5  look, this is what is happening, you know, this money is

6  being taken out of our real estate tax money; it isn't an

7  accounting thing, actually the money is being taken out.

8  That's when it became an issue.

9      Q.    So that we understand the term that we'll

10  discuss in the future, what is a recap sheet?

11      A.    A recap sheet is a recapitulation sheet of all

12  the appropriations, what our expected budget is, how much

13  we're going to need, how much we're going to need to

14  raise in real estate taxes.

15      Q.    Is that a document under Section 59, Section

16  23, if you know?

17      A.    Chapter 59.

18      Q.    Had you prepared recap sheets prior to

19  September of 2000 or been involved with them?

20      A.    Yes.

21      Q.    Had you signed off on them as an assessor?

22      A.    Yes.

23      Q.    And had you prepared the paperwork as a clerk?

**73**

1    **A.** Yes.

2    **Q.** At the time this issue arose in late September

3  of 2000, had the tax rate for Orange been certified by

4  DOR?

5    **A.** No.

6    **Q.** Under what circumstances, to your

7  understanding, are recap sheets prepared and submitted to

8  DOR?

9    **A.** Once the tax rate has been set by DOR.

10    **Q.** For what purpose would it be submitted at that

11 point?

12    **A.** To certify the tax rate.

13    **Q.** Bear with me if you would for a moment.  At the

14 time this issue arose in September, the tax rate had not

15 yet been certified.  Correct?

16    **A.** Right.

17    **Q.** Does that usually happen in November, to your

18 understanding?

19    **A.** Yes.

20    **Q.** Okay.  Had any documents with respect to the

21 tax rate, the appropriations and the like been submitted

22 to DOR at that point in time?

23    **A.** No.

**74**

1    **Q.** So when we speak of a recap sheet in terms of

2  our case here, do I understand it was a sheet that would

3  deal with all the revenues and projected appropriations

4  of Orange to be submitted to DOR?

5    **A.** Right.  Add in the evaluations and all the

6  debts and everything.

7    **Q.** Was the recap sheet that addressed the

8  establishment of the reserve account in 2000 the first

9  recap sheet that was being prepared for the town?

10    **A.** I don't recall.

11    **Q.** Let me ask you a different question to see if

12 it helps.  Had you reviewed a recap sheet for submission

13 to DOR in September or October of 2000 that did not

14 include this reserve account?

15    **A.** I don't recall.

16    **Q.** One way or the other?

17    **A.** Right.

18    **Q.** What was the cut off point, if there were one,

19 to your understanding, for submission of a recap sheet to

20 DOR?

21    **A.** There isn't one.

22    **Q.** But the certification is necessary for the town

23 to conduct its physical affairs, is it not?

**75**

1    **A.** Right.  If the town cannot get it done, then

2  what they do is they do preliminary tax bills.

3    **Q.** The last term?

4    **A.** Preliminary tax bills.

5    **Q.** Basically, though, the tax bills can't be sent

6  out as final bills without that certification from DOR.

7  Is that correct, to your understanding?

8    **A.** Yes.

9    **Q.** What document led you to have the concerns that

10 you just discussed about an impact on the tax rates?

11 What were you looking at that raised that issue to you?

12    **A.** The LA14 which basically comes up with, it's

13 the one that basically divides our budget into our

14 valuations and comes up with the tax rate.  And the tax

15 rate was raised up over two dollars.  So at that point in

16 time you look at it and say there's something wrong here.

17    **Q.** What is the interaction or relationship between

18 the recap sheet and an LA14 form?

19    **A.** That's part of the recap.

20    **Q.** It's part of the recap?

21    **A.** Yeah.

22    **Q.** In Orange in 2000 who prepared the LA14?

23    **A.** I did.

**76**

1    **Q.** Did you just tell me, though, that you looked

2  at an LA14 that had this reserve account on it?

3    **A.** No.

4    **Q.** I'm sorry then.  How did you first learn that

5  this was an issue?  What was submitted to you that raised

6  it in your mind?

7    **A.** The total budget amount and what ends up being

8  the tax rate is the total budget divided into the

9  valuations, and you come up with a tax rate.

10    **Q.** Okay.

11    **A.** It was over two dollars more than it was a year

12 before.  So at that point in time I started looking to

13 figure out, trying to figure out why it was so much, when

14 the whole issue of the ambulance was only supposed to be

15 just an accounting change.

16    **Q.** Who submitted a piece of paper to you that

17 raised that to you?

18    **A.** The town accountant.

19    **Q.** Did you discuss that issue first with the town

20 accountant when you identified it?

21    **A.** No.

22    **Q.** With whom did you first discuss it?

23    **A.** The board of assessors because we had a

79

1   meeting.

2       Q.   Now, in the year prior had there been a tax

3   rate increase in Orange?

4       A.   Yes.

5       Q.   How much was it?  Do you know?

6       A.   I don't recall.  But I believe it was, like,

7   over a dollar because it was a revaluation year.

8       Q.   Just so I don't miss any terms.  Meaning what?

9   What impact did that have on the increase the prior year?

10      A.   What do you mean?

11      Q.   You said because it was a revaluation year.

12      A.   1999.

13      Q.   What impact did that have, that it was a

14  revaluation year?

15      A.   That the values of the town went up.

16      Q.   What document was presented to you by the town

17  accountant?

18      A.   I don't recall the name.  I mean, there's many

19  of them, and they're all.

20      Q.   Whatever the document was, what did it suggest

21  to you when you first looked at it?

22      A.   Oh, it gave me what the budget amount was.

23      Q.   All right.  Was that an issue to you?

1       A.   Yes.

2       Q.   Can you tell me what that discussion entailed?

3       A.   Well, we were, we were doing the -- We had the

4   tax classification hearing for the tax rate.  So prior

5   to --

6       Q.   Before whom?

7       A.   So prior to that we discussed it.

8       Q.   Before whom?

9       A.   I had just got what I needed that day, the day

10  of the tax classification hearing.

11      Q.   My question is, you'll have to bear with me,

12  before whom is the tax classification hearing conducted?

13      A.   The board of selectmen.

14      Q.   What is a tax classification hearing?

15      A.   It's a formality hearing to discuss whether we

16  want to raise the commercial tax rate a couple of dollars

17  to help with the residential or just want to keep the

18  same rate all through, straight across the board.

19      Q.   Did you appear at the tax classification

20  hearing?

21      A.   Yes.

22      Q.   Did another assessor appear with you?

23      A.   Yes.

78

1       A.   Not at that time.  Until I plugged it in.

2       Q.   Plugged into?

3       A.   To calculate the tax rate.

4       Q.   What did that reveal to you?

5       A.   That the tax rate had gone up and somehow there

6   was something in the budget that made it do so.

7       Q.   Did you personally set about to find what had

8   caused that bump in the tax rate?

9       A.   Oh, yeah.

10      Q.   What did you find had done so?

11      A.   That it was from the ambulance account.  It was

12  taken out as an appropriation.

13      Q.   Is the appropriation for the creation of the

14  reserve fund fairly characterized as seed money for that

15  fund?  Is that a proper term on my part?

16      A.   To start it?

17      Q.   Yes.

18      A.   Yes.

19      Q.   And, of course, it remains in the reserve fund,

20  unavailable for other municipal purposes?

21      A.   Right.

22      Q.   So when you saw this, did you discuss it with

23  your brethren assessors?

80

1       Q.   Who was that?

2       A.   Steve Adam and Norman Bartlett.

3       Q.   All assessors?

4       A.   Yeah.  We are all required to be there.

5       Q.   Is it usually a pro forma proceeding?

6       A.   Yes.

7       Q.   But is it fair to say this year that, being in

8   September of 2000, the assessors raised an issue?

9       A.   Yes.

10      Q.   Who spoke before the selectmen?

11      A.   Steve Adam.

12      Q.   Did you speak at all?

13      A.   I don't recall.

14      Q.   Don't recall doing so or don't recall one way

15  or the other?

16      A.   I don't recall doing so.

17      Q.   Do you remember what Mr. Adam said?

18      A.   He said that, basically told them what the

19  effect was on the tax rate.

20      Q.   Did the selectmen make a response to his

21  comment?

22      A.   At that time, no.

23      Q.   Did they make any response to that comment

1  during that meeting?

2      A.  No.

3      Q.  Did anyone in the selectmen indicate whether a

4  bump in the tax rate was something they had even thought

5  of in establishing the reserve account?

6      A.  Yes.  They said that if they knew that would

7  happen that, you know, they said their board does not

8  want to raise the tax rate without -- Well, yeah, I guess

9  they did discuss it.

10     Q.  What do you remember their saying?

11     A.  They said they did not want to raise the tax

12  rate without the taxpayers knowing and it should go to

13  town meeting.  If they, you know, if they want to raise

14  the tax rate, then it should go to town meeting and let

15  the voters vote to do that.

16     Q.  Was Mr. Racicot present at that meeting?

17     A.  Yes, I believe so.

18     Q.  Did he say anything?

19     A.  I believe he said, "Well, we discussed that.

20  You guys already know."  And I don't remember what else

21  he said.

22     Q.  Did anyone in the selectmen contradict him in

23  that statement?

1      A.  They didn't really contradict.  They just said

2  that if we had known it was going to raise the tax rate,

3  I wouldn't have been for something like that.

4      Q.  What is the end result in the usual course of

5  this tax classification hearing?  What vote or what order

6  or what result flows from the selectmen?

7      A.  The selectmen basically just vote whether they

8  want to shift the tax rate or not, if they want to, you

9  know, add more to the commercial tax rate or keep all the

10  tax rates the same.  And they do that upon the

11  recommendation of the board of assessors.

12     Q.  Was it your understanding during September of

13  2000 that because the tax rate had not yet been certified

14  that this expense would then go on the recap sheet to be

15  paid by the taxpayers?  I don't know if that's precise

16  enough.  Am I correct in that?

17     A.  State that again.

18     Q.  I'll try.  Was it your understanding in

19  September of 2000 that since the tax rate had not yet

20  been set that the expense for the funding of the reserve

21  account would be submitted to DOR and then passed on to

22  the taxpayers?

23     A.  No.  That was not my understanding, that it

1  would be passed on to the taxpayers.

2      Q.  What was your understanding?

3      A.  That it was going to be -- My understanding of

4  the whole thing was that they were going, whatever the

5  fire department had the next year, that their income

6  would go into this fund little by little throughout the

7  year.  It wasn't my understanding that was going to be

8  taken from the real estate taxes as a line appropriation

9  and done that way.

10     Q.  All right.  I'm sorry.  You lost me which is

11  probably my fault.  Where was this initial funding for

12  the reserve account to come from, as you understood it,

13  in September of 2000?

14     A.  It was my understanding that it would come from

15  the fire department, that they were going to do an

16  accounting change.  So any income that came in from the

17  fire department was going to go into this fund.

18     Q.  I understand.  Later you found out differently.

19  Correct?

20     A.  Yes.

21     Q.  In terms of your later understanding, was it

22  then that the funding initially for this account would

23  come from the taxpayers out of the tax rate?

1      A.  Yes.

2      Q.  What action did the selectmen take ultimately

3  at the tax classification hearing?

4      A.  They didn't take any action.

5      Q.  What was the date of that?  Do you recall?

6      A.  I don't recall.

7      Q.  Would it refresh your memory if I suggested it

8  was on or about October 4, 2000?

9      A.  Yes.

10     Q.  At the time you left the classification hearing

11  which we have established was on October 4, 2000, what

12  did you understand was the next contemplated step about

13  the so-called recap sheet?

14     A.  We didn't really have one at that point because

15  the board had seemed like they were, you know, didn't

16  have an understanding of what was exactly going on.

17     Q.  When during the October, 2000, period did you

18  first start working on the recap sheet paperwork?

19     A.  I had done -- I had already started on it prior

20  to that.

21     Q.  You were setting it up in a certain fashion

22  without the reserve account included.  Correct?

23     A.  Right.

89

1  reserve account?

2     A.  Yes.

3     Q.  And did you make a choice as clerk not to

4  include that amount?

5     A.  No.

6     Q.  Did someone direct you not to put that amount

7  in there?

8     A.  I didn't have anything to do with the amount.

9  It was the budget.  It comes from the budget amount,

10  which it's not our responsibility to do the budget.

11    Q.  I'm sorry.  Please bear with me on this, but I

12  think you indicated that you could have --

13    A.  It's not my choice of putting the 160 in or

14  putting it out.  It's not my choice to make that call.

15  That comes from the accounting department.

16    Q.  All right.  At any time when you were filling

17  out that portion of the recap sheet that you were

18  responsible for, did you have a budget from accounting

19  that included the reserve account?

20    A.  Yes.

21    Q.  Is there some reason why you did not include

22  that budgetary or budget matter for the reserve fund in

23  the recap sheet for signature by the assessors?

90

1     A.  At that point, I mean, you're talking two

2  different things.  It didn't have anything to do with the

3  assessors.

4     Q.  Okay.

5     A.  As far as me putting a number in, it didn't

6  have anything to do with that.

7     Q.  What were the assessors ultimately signing off

8  on?

9     A.  The assessors are responsible for the levy, the

10  valuations, the tax rate.  I know there's more, but.

11    Q.  To your understanding, is the signature of the

12  assessors a prerequisite to the recap sheet's filing with

13  DOR?

14    A.  Yes.  It's the assessors' responsibility to

15  send in the recap sheets to DOR.  It's in Chapter 59.

16    Q.  During October of 2000, did you discuss with

17  the other assessors whether or not you as a body would

18  sign off on a recap sheet that had the reserve account

19  funding included?

20    A.  Well, when we got -- It was at that selectmen's

21  meeting on October 4th.  We were going to discuss it that

22  next week at our meeting.

23    Q.  Did you ever do so?

91

1     A.  Yes, we did.

2     Q.  What determination was made?

3     A.  There was an assessor missing, so we tabled it

4  until the next week.

5     Q.  What happened then?

6     A.  I got suspended.

7     Q.  But certainly not suspended as an assessor.

8  Correct?

9     A.  Well, what.

10    Q.  On the recap sheet -- I'll get a foundation, so

11  strike that question.  Did the assessors sign a recap

12  sheet that fall?

13    A.  Yes.

14    Q.  Did you sign it?

15    A.  Yes.

16    Q.  And did it include the reserve fund item?

17    A.  No.

18    Q.  When did the assessors first discuss not

19  signing a recap sheet with that item in there?

20    A.  It wasn't specifically discussed.

21    Q.  Before you went to the classification meeting,

22  did you know that you would not sign a recap sheet with

23  the reserve account included?

92

1     A.  At that point in time, I wanted to do a little

2  bit more research about what exactly was going on.

3     Q.  At what point did you decide you would not sign

4  such a recap sheet?

5     A.  When I figured out where it had come from when

6  I talked to the town accountant the next day.

7     Q.  After you talked to the town accountant, did

8  you discuss your discovery with other assessors?

9     A.  No.  I let them do their own stuff.

10    Q.  Do you know how it came to be that the recap

11  sheet in the fall of 2000 did not include the reserve

12  account?

13    A.  Yes.

14    Q.  Explain to me, please.

15    A.  The board of selectmen voted not to have the

16  reserve account.  They rescinded their vote.

17        MR. TEHAN:  Off the record.

18        (Discussion off the record.)

19    Q.  At some point in time after the classification

20  hearing on October 4th, 2000, did Mr. Racicot approach

21  you about the recap paperwork?

22    A.  Yes.

23    Q.  Do you recall the date on which he did so?

1    A.    It was that next morning, I believe.
2    Q.    That being October 5th?
3    A.    Yep.
4    Q.    What did he say to you and what did you say to
5    him?
6    A.    He wanted the recap sheet. I told him that we
7    were going to sign it at our next meeting which was on
8    Monday.
9    Q.    Okay. Did you have any discussion with him at
10   that point about whether the recap sheet was going to
11   include the reserve account?
12   A.    No.
13   Q.    Did he ask you if the recap paperwork you were
14   working on included the reserve account?
15   A.    Not that I recall.
16   Q.    At the point of that discussion had you
17   determined that you would not sign a recap sheet that had
18   that item in it?
19   A.    Well, I wanted a little bit more research done.
20   Q.    Of what type?
21   A.    To -- I don't remember if I knew exactly.
22   Q.    Did Mr. Racicot make any comment to you that
23   the recap would be addressed and signed at the next

94

1    meeting of the assessors?
2    A.    What?
3    Q.    Did he make any comment when you told him that?
4    A.    I don't recall.
5    Q.    How would you characterize the tone of your
6    discussion with him at that point?
7    A.    My tone?
8    Q.    Yours and his.
9    A.    It was normal. He was anxious, though.
10   Q.    What made you feel that way?
11   A.    Just his approach because the recap sheet isn't
12   the responsibility of the town administrator; it's always
13   been the assessors.
14   Q.    Were you surprised that he was following up on
15   that matter?
16   A.    Yes.
17   Q.    Did you ask him why he was?
18   A.    No. I kind of knew why.
19   Q.    Well, why did you think you knew why?
20   A.    Because of the meeting that prior night.
21   Q.    What about it?
22   A.    He wasn't very happy.
23   Q.    By the assessors' comments?

1    A.    Yes.
2    Q.    What did he say or do that led you to feel he
3    wasn't very happy about the assessors' comments?
4    A.    Just his actions. Just ordinary actions.
5    Q.    Like what?
6    A.    Just the way he came in the next day.
7    Q.    When he saw you?
8    A.    Yeah.
9    Q.    Are you saying that the very fact he came to
10   you was out of the ordinary?
11   A.    Well, yeah. Yeah. And he talked about, you
12   know, he talked about it like nothing ever happened last
13   night, and that he didn't acknowledge anything that
14   happened and, you know, none of the selectmen's concerns.
15   Q.    Did you have subsequent discussions with Mr.
16   Racicot before you were suspended --
17   A.    Yes.
18   Q.    -- about the recap sheets?
19   A.    Yes.
20   Q.    Where did those discussions take place?
21   A.    In his office and my office.
22   Q.    How many times prior to your suspension did you
23   discuss the issue of the preparation of the recap sheet

96

1    with Mr. Racicot?
2    A.    Once in his office after Arthur Reppas left my
3    office when he said he had discussed changing his vote,
4    and I went into his office, to Mike's office, and said,
5    "Look, you know, he told me not to do -- Arthur Reppas
6    told me not to do anything with the recap sheet until he
7    could figure out what was going on," and he was chairman
8    of the selectmen. And so I told that to Mike. He just
9    said, "Well, four people ain't going to hold this town
10   hostage."
11   Q.    Let me backtrack a moment. You had a
12   discussion with Mr. Racicot, to your knowledge, the day
13   after the classification hearing, that being October 5th,
14   correct, to the best of your memory?
15   A.    Yes.
16   Q.    You have already spoken and told me everything
17   that happened at that meeting?
18   A.    Yes.
19   Q.    After that meeting did you have a discussion
20   with select board chair Reppas?
21   A.    Yes.
22   Q.    And how did that come to be? Did you ask to
23   meet with him?

**97**

1    A.   No.  He came into my office.

2    Q.   And was anyone present for your discussion with

3 Mr. Reppas?

4    A.   No.

5    Q.   What did you say to him and what did he say to

6 you?

7    A.   He said to me that he was concerned about

8 raising the taxes and that he wanted to know if I had

9 sent in the recap sheet yet.  I told him no.  He said,

10 "Well, don't.  Hold on to it because I have a few

11 concerns that I want to take care of."

12    Q.   In that discussion, did Mr. Reppas indicate to

13 you whether he had told Mr. Racicot about his concerns?

14    A.   Yes.

15    Q.   What did he say?

16    A.   He said that he had just been down and spoke to

17 Mike and -- Because I told him, I told him, I said,

18 "Well, Mike has been in here wanting the recap sheet

19 wanting to get it sent out."  He said, "Don't worry about

20 him."  He had just come from his office, so I assumed he

21 had spoke with him.

22    Q.   Because he said don't worry about him?

23    A.   Yes.

**98**

1    Q.   Did he ever expressly tell you, explicitly tell

2 you he had discussed this change of heart, so to speak,

3 with Racicot?

4    A.   No.

5    Q.   How long after the meeting with Reppas was it

6 that you met with Racicot in his office?

7    A.   He wanted the recap sheets again.

8    Q.   I appreciate that, but you didn't answer my

9 question.  How long after you met with Reppas was it that

10 you met with Racicot?

11    A.   I believe it was that same day.

12    Q.   Were you summoned to his office?

13    A.   Yes.

14    Q.   How did that happen?  Did he call you on the

15 phone?

16    A.   I don't recall.

17    Q.   You don't know how it is that he summonsed you

18 there as you sit here today?

19    A.   I can't recall if somebody came in and said,

20 you know, Mike wants to see you or.

21    Q.   Okay.  Forgive me because I think you touched

22 on this.  I don't want to waste time, now that I

23 understand the timing of things.  Tell me what you said

**99**

1 to Racicot and what he said to you.

2    A.   He told me that he, regarding the whole recap

3 issue, that he was not going to let four people hold the

4 Town of Orange hostage and he would have the recap sheet

5 and it would be on his desk and it would be there by

6 four o'clock.

7    Q.   Did you have an understanding as to whom the

8 four people were?

9    A.   Yes.

10    Q.   Who were they?

11    A.   The three board of assessors members and Arthur

12 Reppas.

13    Q.   Did you make any comment in response?

14    A.   I did tell him that he came into my office and

15 told me that he didn't want them to go out.  And that's

16 when he said, you know, "Four people ain't going to hold

17 the town hostage."

18    Q.   Too many hes.  You told Racicot what Reppas had

19 told you?

20    A.   Yes.

21    Q.   Was there ever an occasion when Mr. Racicot

22 came to your office and you yelled at him, "Why are you

23 being nasty to me?  Why are you demanding that I finish

**100**

1 the work?"

2    A.   No.

3    Q.   Prior to the point when you got suspended did

4 you feel he was being nasty to you?

5    A.   Yes.

6    Q.   What did he say or do that led you to believe

7 he was being nasty?

8    A.   He was very downgrading when he spoke to me.

9 Just different things.  Basically that, you know, like,

10 wanting to take over the whole recap thing, and it didn't

11 have anything to do with him.  It was our office that got

12 it ready and sent it out, and it was our office that the

13 DOR called and said everything was okay.  It didn't have

14 anything to do with him.  For him to get just so

15 involved, it just kind of, I don't know.

16    Q.   Are these things that you not only felt but

17 told him?

18    A.   No.

19    Q.   Did you make any response when he made the

20 comment about hostage?

21    A.   No.

22    Q.   At the time that you had this discussion with

23 Mr. Racicot, had the board of selectmen as a body, as

101

1 opposed to Mr. Reppas's opinion, yet rescinded its prior

2 vote approving this account?

3     **A.** No.

4     **Q.** At what point did it do so?

5     **A.** At the next meeting. They have a meeting every

6 two weeks.

7     **Q.** So the recap sheet was not prepared until after

8 that meeting?

9     **A.** Right.

10     **Q.** Or was that -- Is that correct?

11     **A.** Right.

12     **Q.** Did you present Mr. Racicot with recap sheet

13 paperwork by four o'clock as he had stated?

14     **A.** No.

15     **Q.** Why not?

16     **A.** Because I didn't feel that I had to do that.

17 It wasn't completed anyways. And the first -- There was

18 one of the pages, that the town clerk was gone and there

19 was somebody sitting in for her. He had her sign for the

20 town clerk. So I wasn't about to give him the papers and

21 let him sign for the assessors. That's one of the

22 reasons I felt that I, you know, and the other reason is

23 that if he had any problems with it, he needed to discuss

102

1 it with the board, not with me. With the board of

2 assessors.

3     **Q.** What form are you referring to that you say was

4 supposed to be signed by the town clerk?

5     **A.** The appropriations form, the debt, what was

6 voted in for debt.

7     **Q.** And was that form signed by somebody?

8     **A.** Yes.

9     **Q.** By whom?

10     **A.** Shirley Paige.

11     **Q.** Who is that?

12     **A.** She was the old town clerk.

13     **Q.** In the fall or October of 2000, what position

14 did she hold with the town?

15     **A.** None.

16     **Q.** Is the town clerk elected?

17     **A.** Yes.

18     **Q.** Is it Miss Paige, is that what you said?

19     **A.** Yes.

20     **Q.** Had she been defeated in an election?

21     **A.** No. She retired.

22     **Q.** When?

23     **A.** That March.

103

1     **Q.** Some seven months prior?

2     **A.** Yes.

3     **Q.** And --

4     **A.** I believe. I believe.

5     **Q.** And did you see Miss Paige's signature on a

6 form?

7     **A.** Yes.

8     **Q.** Did you ask Mr. Racicot how it got there?

9     **A.** No.

10     **Q.** Did you discuss with him that the person who

11 signed it was no longer the clerk?

12     **A.** No.

13     **Q.** Did you ever discuss with anyone the

14 circumstances that gave rise to Miss Paige's signature of

15 this document?

16     **A.** No.

17     **Q.** Did you ever ask her how it came to be she

18 signed it?

19     **A.** Yeah. I guess I did. Because he was trying to

20 get the recap sheet through, so if there was any more

21 discussions on the ambulance that, they couldn't be done

22 anyways because the tax rate was already set.

23     **Q.** Try me again. Explain that, please. I'm

104

1 sorry.

2     **A.** He had her sign it because the town clerk

3 wasn't going to be back until the beginning of the next

4 week to sign it. He wanted to get the paperwork through

5 and have the tax rate all set before the selectmen could

6 discuss it further or do anything further.

7     **Q.** With the reserve account included?

8     **A.** Yes.

9     **Q.** Again, did you ever discuss --

10     **A.** The correct papers went out with the town

11 clerk, Nancy Blackmer, on the paperwork.

12     **Q.** I appreciate that. I asked you once already.

13 Let me try again. Did you ever find out from anyone what

14 the circumstances were that gave rise to the former town

15 clerk signing part of the recap sheet?

16     **A.** No. There wasn't really anybody that I could.

17     **Q.** You didn't discuss it with Mike Racicot?

18     **A.** No.

19     **Q.** You didn't discuss it with Miss Paige?

20     **A.** No.

21     **Q.** Was it a concern to you when she signed that?

22     **A.** Yes. Because she's no longer a town employee.

23     **Q.** How did you come to see the form that the

105

1  former clerk signed?

2  **A.**  Because they brought it to me.  It was brought

3  to me.

4  **Q.**  Who is "they"?

5  **A.**  Shirley Paige.

6  **Q.**  Did she appear at your office with the signed

7  form?

8  **A.**  Yes.

9  **Q.**  At that point you didn't ask her why she was

10  signing it?

11  **A.**  No.  I knew why.

12  **Q.**  Well, why did you think you knew why?

13  **A.**  Well, well, because of way he was pushing the

14  issue to get the paperwork out.

15  **Q.**  Are you aware of any motive or reason unrelated

16  to his duties as town administrator why Mr. Racicot

17  wanted to move this process?

18  **A.**  Because he wanted to fix the problem.

19  **Q.**  What problem?

20  **A.**  Well, the ambulance had had a really bad

21  history.  And as far as being able to collect their funds

22  and everything from the ambulance calls, we had a

23  committee set up.  And so basically that was.

106

1  **Q.**  Was the ambulance running in the red

2  traditionally?

3  **A.**  Yes.

4  **Q.**  Was it your understanding Racicot's motive with

5  respect to this proposal was that the reserve account

6  would make ambulance more accountable for getting the

7  money it was due?

8  **A.**  Yes.

9  **Q.**  At four o'clock did you have any further

10  discussion with Mr. Racicot?

11  **A.**  No.  I just left.

12  **Q.**  Did he come to your office the next morning?

13  **A.**  No.  There was a note on my desk to go see him.

14  **Q.**  Did it say anything more than that?

15  **A.**  No.

16  **Q.**  Was it one of the pink slips?

17  **A.**  No.

18  **Q.**  Was it signed by Mr. Racicot?

19  **A.**  Yes.  Just said Mike.  I still have it.

20  **Q.**  You do?  Did you go see him?

21  **A.**  Yes, I do.

22  **Q.**  Where did you see him?

23  **A.**  In his office.

107

1  **Q.**  Was this the first thing in the morning?

2  **A.**  Yes.

3  **Q.**  Was it about nine o'clock?

4  **A.**  Yep.  A little bit after.

5  **Q.**  Sorry?

6  **A.**  A little bit after.

7  **Q.**  Was anyone present for your discussion?

8  **A.**  No.  There really wasn't a discussion.  I went

9  in, and he started asking about the recap sheets.  I

10  turned around and went back to my office.

11  **Q.**  Did you make any verbal response to his

12  inquiry?

13  **A.**  None.

14  **Q.**  Why not?

15  **A.**  Because my response would have been the same.

16  **Q.**  What next happened?

17  **A.**  He came into my office.  Wait a minute.

18  He came into my office.

19  **Q.**  Are you looking at your answers to

20  interrogatories?

21  **A.**  Yep.

22  **Q.**  Which isn't inappropriate.  I'm not suggesting

23  anything wrong.  But do you have an independent memory of

108

1  that, as though the paper were not in front of you?

2  **A.**  Yes.

3  **Q.**  Try it that way and tell me what happened.

4  **A.**  He came back into my office, wanted the recap

5  sheets, and then I told him I didn't have them, and he

6  said, "Well, I want them."  And finally that day I did

7  end up giving it to him.

8  **Q.**  Okay.  At what point during the day did you

9  give him the recap sheet materials?

10  **A.**  I think it was afternoon.

11  **Q.**  And did those materials include the ambulance

12  reserve item?

13  **A.**  No.

14  **Q.**  What was the state of completion of the recap

15  sheet at the time you gave it to Mr. Racicot?

16  **A.**  It needed signatures.

17  **Q.**  Of whom?

18  **A.**  The assessors.

19  **Q.**  Did it need anything else?

20  **A.**  No.

21  **Q.**  Was it a complete package, to your

22  understanding, ready for submission to the state apart

23  from the assessors approval?

1   A.   Yes.

2   Q.   Did Mr. Racicot review that -- Is it a packet?

3   A.   Yes.

4   Q.   Did he review it in your presence?

5   A.   No.

6   Q.   Did he say anything when you gave it to him?

7   A.   No.

8   Q.   Did you say anything?

9   A.   No.  Oh, I told him, I said, "You can have

10  them, but they're not signed."

11  Q.   What did he respond?

12  A.   He knew the assessors hadn't signed them.

13  Q.   Did he say anything?

14  A.   I don't recall that he said anything.

15  Q.   Okay.  Now, what is the date of the event that

16  we are discussing, as best you can recall?

17  A.   I think it was, I believe it was a Thursday.

18  Q.   Was it October 13th?  Was it the same day you

19  got suspended?

20  A.   No.  It was the day before.  It was the day

21  before because he had already, he had already got the --

22  Maybe it was the same day.

23  Q.   Let's see if I can go over something with you.

110

1   Did you speak with Mr. Reppas on October 12th?

2   A.   Yes.  No.  No.  It was -- It would have been

3   October 5th.  It was, like, the next day or somewhere

4   after that, after this selectmen's meeting.

5   Q.   When Reppas told you that he was reconsidering

6   approving the reserve account.  Correct?

7   A.   Yes.

8   Q.   Now, did you give Mr. Racicot the recap packet

9   or the recap sheet on the same day you were suspended?

10  A.   Yes.  I did.

11  Q.   Now, at some point on that same day did you

12  attend what was called a financial team meeting?

13  A.   Yes.

14  Q.   Did you attend that before you were suspended?

15  A.   Yes.

16  Q.   Did you attend it on the same day you were

17  suspended?

18  A.   Yes.

19  Q.   Now, what is the financial team?

20  A.   The tax collector, the town accountant, the

21  community development, the treasurer.

22  Q.   And was it -- With what frequency did the team

23  meet?

1   A.   Every other Friday.

2   Q.   Did you attend those meetings regularly?

3   A.   Yes.

4   Q.   In what capacity?

5   A.   As assessors clerk.

6   Q.   What was your role on the financial team, as

7   you understood it?

8   A.   We really didn't have one.

9   Q.   Why did you go?

10  A.   Because it was requested that a member from

11  each board go.

12  Q.   Now, was it usual or customary for the town

13  administrator to attend those meetings?

14  A.   Yes.

15  Q.   Had Mr. Racicot regularly attended them during

16  his tenure up to that point?

17  A.   Yes.

18  Q.   Now, do you recall the meeting of the financial

19  team that transpired on the day you were suspended?

20  A.   Yes.

21  Q.   By the way, so that we're not too vague about

22  it, were you suspended on October 13th, 2000?

23  A.   Yes.

112

1   Q.   Who was in attendance at that particular

2   meeting, giving me both their titles and their names?

3   A.   Virginia Jones, treasurer; Doris Bittenbender,

4   town accountant; Jerilyn Deyo, tax collector; Lynn

5   Boutwell, water department; Wendy Johnson, community

6   development; and Mike and me.

7   Q.   I'll give you a very open-ended question.  What

8   happened at that meeting?

9   A.   Well, the meeting kind of started off well.  We

10  were discussing, you know, a little bit about the budget,

11  and then all of a sudden everything kind of turned

12  towards me.  Basically, I was told that I needed to

13  explain how come the town is going to have to borrow

14  money, and prior to that borrowing of money was the

15  subject with the town treasurer.

16  Q.   May I stop you for a moment?  What was the town

17  treasurer discussing borrowing money for?

18  A.   Because the tax rate wasn't set because the

19  recap sheets weren't sent in.

20  Q.   Who then stated that the town was going to have

21  to -- Strike that.  Was the first person to discuss the

22  necessity for borrowing money the treasurer?

23  A.   No.  It was Mike.

115

113

1   **Q.**  What did he say?

2   **A.**  He asked her what would happen if the tax rate

3  didn't get set until a certain time.

4   **Q.**  What time, did he specify?

5   **A.**  No.

6   **Q.**  What was the response?

7   **A.**  And she basically told him what would happen in

8  that case, how the town would go about borrowing money.

9   **Q.**  Was that discussion --

10   **A.**  It was basically a discussion between those

11  two, and everybody else was just watching them.

12   **Q.**  Were you involved in that discussion?

13   **A.**  No.

14   **Q.**  Had you said anything at the meeting that you

15  remember to that point?

16   **A.**  No.

17   **Q.**  Did the discussion turn towards you after that

18  point?

19   **A.**  Yes.

20   **Q.**  Who directed the discussion toward you?

21   **A.**  Mike did.

22   **Q.**  What did he say?

23   **A.**  He said, "Well, now that we know about

114

1  borrowing, now I'll turn the meeting over to Shari so she

2  can tell you why."

3   **Q.**  Did you say anything at that point?

4   **A.**  Yes.  I told them this wasn't the time or place

5  to discuss this, and, if he wanted to discuss it, then he

6  needs to call the other assessors.

7   **Q.**  Did you raise your voice at that point?

8   **A.**  I may have a little bit.

9   **Q.**  Do you think you were yelling at him at the

10  meeting?

11   **A.**  No.  Because he was yelling at me.  So if I was

12  yelling at him, then I really couldn't tell the

13  difference.

14   **Q.**  As you sit here today, would it be most fair to

15  say both of you had your voices raised?

16   **A.**  Possibly.

17   **Q.**  Is there anything further that you and Mr.

18  Racicot said to each other at that meeting?

19   **A.**  No.  He said, "Well, after this meeting I want

20  to see you out there."

21   **Q.**  You made a gesture with your hand.  Did he make

22  a gesture with his hand?

23   **A.**  Yes.

1   **Q.**  Reflecting, of course, the court reporter can't

2  take pictures, why don't you give a verbal picture of the

3  gesture he made with his hand?

4   **A.**  It was straight out forward, and then he

5  pointed to the elevator shaft.  He swung it around and

6  pointed to the elevator shaft.

7   **Q.**  Did he have his index finger pointed?

8   **A.**  Yes.

9   **Q.**  When you say the elevator shaft, what do you

10  mean?

11   **A.**  It's the room for the elevator.

12   **Q.**  Was it an area that could be used for a private

13  discussion?

14   **A.**  An office would work well.

15   **Q.**  I appreciate that.  Maybe in the alternative,

16  that's correct?

17   **A.**  It was very secure.  Nobody would be able to

18  hear anything.

19   **Q.**  Was anything further said between you and Mr.

20  Racicot at that meeting?

21   **A.**  No.

22   **Q.**  After you and Mr. Racicot -- Strike that.  Mr.

23  Racicot had indicated he wanted to speak with you after

116

1  the meeting.  Correct?

2   **A.**  Yes.

3   **Q.**  Did the meeting continue from that point

4  forward?

5   **A.**  Yes.  But not for very long.

6   **Q.**  Do you remember anything else that happened?

7   **A.**  No.

8   **Q.**  Did you say anything else?

9   **A.**  No.

10   **Q.**  Did Mr. Racicot say anything else?

11   **A.**  He spoke a little bit, but I can't recall what

12  he was saying.

13   **Q.**  Was it unrelated to you?

14   **A.**  Yes.

15   **Q.**  Did you perceive yourself as being

16  disrespectful to Mr. Racicot at the meeting?

17   **A.**  No.

18   **Q.**  Did you perceive yourself as antagonistic to

19  him at the meeting?

20   **A.**  No.

21   **Q.**  Did he ever state to you that he perceived your

22  comments in that way?

23   **A.**  No.

119

1    Q.  At any time has he ever told you that?

2    A.  No.

3    Q.  Why did you feel that the financial team

4  meeting was an inappropriate forum for Mr. Racicot's

5  comment?

6    A.  Because what he was basically getting down to

7  is him not having the recap sheets.

8    Q.  Why was that inappropriate in that meeting?

9    A.  Because just the whole context of the

10  conversation.  If it was a conversation of, you know, our

11  recap sheet hasn't been done yet, it hasn't been sent in,

12  if we have to borrow what are we going to do, you know,

13  that would be a little bit different, instead of the

14  context that it was in.  Like, it was this big game that,

15  you know, you know, "We're going to have to borrow money.

16  So, Ginny, how are we going to borrow money?"  So she

17  goes through her own spiel of how we do it.  Then he

18  says, "Now, Shari, you can tell us how we have to do

19  that."  So what would my answer be?  Because the

20  assessors haven't signed the recap sheet?  What was the

21  point?  That's why I said, you know, "This ain't the

22  place to discuss this."

23    Q.  After the meeting was over, did you meet with

118

1  Mr. Racicot in the area near the elevator?

2    A.  Yes.  I did.

3    Q.  Was anyone else present for that meeting?

4    A.  No.

5    Q.  Did he present you with a piece of paper at

6  that point?

7    A.  Yes.

8    (Document marked Exhibit No. 4 for Id.)

9    Q.  I trust you're familiar with what we marked as

10  Exhibit 4?

11    A.  Yes.

12    Q.  Is that the document that was presented to you

13  at that meeting near the elevator?

14    A.  Yes.

15    Q.  Is it, indeed, a notice of suspension for

16  insubordination and failure to perform duties?

17    A.  Yes.

18    Q.  Prior to -- Was it at that meeting that Mr.

19  Racicot presented you with this document?

20    A.  Yes.

21    Q.  Was there any discussion between you before he

22  did so?

23    A.  Yes.

119

1    Q.  Would you just tell me, as best you can, what

2  he said to you and what you said to him before he handed

3  you Exhibit 4?

4    A.  He started discussing the recap sheet again,

5  and by that time it was kind of a stale subject for me,

6  so I told him, you know, you know, there's two other

7  members on the board, if you want, you know, want

8  signatures for that.  Because he had already gotten the

9  recap sheet.  It didn't have the assessor signatures.

10  That is what he was looking for.  I told him he needs to

11  leave me out of it and he needs to get ahold of those two

12  and deal with those two instead of me.

13    Q.  Is it your contention, your testimony today,

14  that apart from the assessors' signatures, the recap

15  sheet that you gave to Mr. Racicot was otherwise

16  complete?

17    A.  Yes.

18    Q.  Go ahead and continue with the discussion with

19  him.

20    A.  At that point in time I just told him, you

21  know, I really didn't want to discuss this with him

22  anymore, that, you know, it was just, there was just a

23  bad, you know, it was bad feelings.  And, you know, I was

120

1  getting ready to leave to go out the door, and he said,

2  "So does that mean you're not going to sign the recap

3  sheet?"  I said, "No, I'm not going to sign it."  And

4  then he handed me the paper.  Then I told him, I said,

5  "You know what, I've lost so much respect for you, you

6  know."

7    Q.  Did Mr. Racicot ever order you to sign the

8  sheet?

9    A.  No.  No.  But I got suspended because I didn't

10  sign it.

11    Q.  I appreciate your comment.  But your answer

12  stands, I take it, he never directly ordered you to do

13  so?

14    A.  No.  No.  Because the talk was they weren't

15  complete.  Not that they didn't have signatures on them.

16  That they weren't complete.

17    Q.  Did you ever discuss with Mr. Racicot what

18  incompleteness he saw in the forms?

19    A.  No.

20    Q.  Now, those forms didn't have the reserve

21  account in them.  Correct?

22    A.  Right.

23    Q.  When they went to the state, they didn't have

129

1  the human resources board first, then to the selectmen,
2  if necessary?
3      A.  Yes.  But that's not what the personnel bylaw
4  says.  It says it goes to the selectmen and then to the
5  human resource board.
6      Q.  Is your personnel bylaw in effect today the
7  same as it was in 2000?
8      A.  Yes.
9      Q.  You have looked it over?
10      A.  Yes.
11      Q.  Your understanding of that document is that --
12      A.  You go to --
13      Q.  Let me ask the question.  With respect to
14  suspensions, the first avenue of appeal is to the
15  selectmen?
16      I'll give you a different question.  From your
17  review of the personnel bylaw --
18      A.  The reason --
19      Q.  Hear me out.
20      A.  I can answer.  I can answer.
21      Q.  It's a messy question.
22      A.  The reason why I went to the selectmen is
23  because this came from their employee.

131

1      Q.  Did you make a request to Mr. Racicot that you
2  be placed on the board of selectmen agenda to review and
3  appeal your suspension?
4      A.  To discuss this, yes.
5      Q.  To discuss what?
6      A.  This suspension.
7      Q.  Yes.  Okay.  And did he ever respond verbally
8  to you about that request?
9      A.  No.
10      Q.  So is his only response what is set forth in
11  Exhibit 5?
12      A.  Yes.
13      Q.  Is it fair to say that ultimately in that
14  document he said you should go to the human resources
15  board first?
16      A.  Yes.
17      Q.  Did you do so?
18      A.  I tried.
19      Q.  Well, you were heard by the human resources
20  board.  Correct?
21      A.  Yes.
22      Q.  Was there some problem in getting before them?
23      A.  Yes.

130

1      Q.  Okay.  I appreciate that.  But my question is
2  this.  What was your understanding from review of the
3  personnel bylaw in effect in October of 2000 as to the
4  first route of appeal for an employee with respect to a
5  suspension?
6      A.  You go to the department head.
7      Q.  Did you view that as an applicable route for
8  you?
9      A.  Yes.  The selectmen's meeting.
10      Q.  In a sense, as an assessor are you a department
11  head yourself?
12      A.  The chairman would be.
13      Q.  Based on your understanding of the personnel
14  bylaw, did you approach the chair of the board of
15  assessors to appeal your suspension?
16      A.  No.
17      Q.  Why not?
18      A.  Because the board of assessors is an elected
19  position, and they don't have any authority over the
20  board of selectmen.  This came from him, and,
21  irregardless of whether anybody did anything, he was the
22  one that was there.  Not the board of selectmen or the
23  board of assessors.

132

1      Q.  What was the nature of that problem?
2      A.  I called the chairman of the human resource
3  board, and he said, "Well, you need to call Mike to get
4  an appointment."
5      Q.  Okay.  Did you say, "I have already been to see
6  Mike, already asked Mike"?
7      A.  Yes.
8      Q.  And what --
9      A.  "I'm sorry.  You're going to have to make an
10  appointment with him."
11      Q.  This was Mr. Hawkins telling you this?
12      A.  Yes, it was.
13      Q.  I don't want to cut you off on any answer, but
14  let's see if we can put it this way.  What steps did you
15  ultimately take to get in front of the human resources
16  board?  You spoke with Mr. Hawkins, he directed you back
17  to Mr. Racicot?
18      A.  Yes.
19      Q.  What did you next do?
20      A.  I went to him and made an appointment.
21      Q.  An appointment through Mr. Racicot with the
22  human resources board?
23      A.  Yes.  It was supposed to be ten days.  I got

133

1  thirty. I had to wait for over thirty days.

2      Q.   Before you met with him?

3      A.   Yes.

4      Q.   I'm going to show you another document which I

5  would ask be marked as Exhibit 6.

6          (Document marked Exhibit No. 6 for Id.)

7          MR. TEHAN:  Off the record.

8          (Whereupon, at 12:55 p.m., the deposition

9  recessed for lunch.)

10         AFTERNOON SESSION    (1:40 p.m.)

11     Q.   (by Mr. Tehan)  Miss Littlewood, I have placed

12 in front of you a document marked as Exhibit 6 which

13 appears to be a letter from you to the personnel board

14 dated October 28, 2000. Do you see it?

15     A.   Yes.

16     Q.   Is it an accurate copy of a letter that you

17 sent to that board on that date?

18     A.   Yes.

19     Q.   Let me direct your attention to the fourth

20 paragraph beginning with the word Mr. Racicot. Do you

21 see that?

22     A.   Yes.

23     Q.   Is the demand that you reference there and

134

1  address it to Mr. Racicot something that he made in his

2  meeting with you near the elevator or, stated

3  differently, where did that demand take place?

4      A.   That was in my office.

5      Q.   The day prior to your suspension?

6      A.   No. That morning.

7      Q.   The morning you were suspended?

8      A.   The first, yeah, the first meeting that I had

9  with him.

10     Q.   Just to try to reconcile something. We have

11 identified in Exhibit 5 that your notice of suspension is

12 dated October 13th, have we not?

13     A.   Yep.

14     Q.   And in your letter to the personnel board you

15 reference that this demand was on October 12th. Does

16 that suggest to you that --

17     A.   That was the day before that he suspended me,

18 yes.

19     Q.   Did he at that point, the day prior to your

20 suspension, tell you that he would get the required

21 signatures on the recap form?

22     A.   Yes.

23     Q.   And there's a reference here that it would be

135

1  delivered to Worcester that day. Do you see that?

2      A.   Yes.

3      Q.   What's in Worcester?

4      A.   The DOR.

5      Q.   Was there any time trigger --

6      A.   No.

7      Q.   -- on October 12th?

8      A.   No. There really wasn't any time trigger

9  throughout the whole thing.

10     Q.   Except that you couldn't send out tax bills

11 until the tax rate was certified. Correct?

12     A.   Right.

13     Q.   Your letter which we are discussing now,

14 Exhibit 6, is to the personnel board. Do you see that?

15     A.   Yep.

16     Q.   Is that the same as the human resource board?

17     A.   Yes.

18     Q.   Indeed, were Mr. Hawkins, Pond, Goldings and

19 Gabenas the members at that time?

20     A.   Yes.

21     Q.   An even number of people on the board. Is that

22 correct?

23     A.   I think they had an alternate. But the ones

136

1  that I knew of, that's who was on it.

2          (Document marked Exhibit No. 7 for Id.)

3      Q.   I have placed in front of you what we have now

4  marked Exhibit 7 which appears to be a handwritten letter

5  from Joe Hawkins to you dated November 1st, 2000. Did

6  you receive the original of this letter on or about that

7  date?

8      A.   Yes.

9      Q.   Recognizing that it technically speaks for

10 itself, did this letter establish a date for a meeting

11 with you and the human resource board on November 14th?

12     A.   Yes.

13         (Document marked Exhibit No. 8 for Id.)

14     Q.   I have next placed in front of you a document

15 dated November 8th which appears to be a letter to you

16 from Mr. Racicot. My first question is, did you receive

17 this letter on or about that date?

18     A.   I don't recall.

19     Q.   Do you ever remember receiving this letter?

20     A.   Yes.

21     Q.   There's a reference that the human resource

22 board hearing will be conducted in executive session. Do

23 you see that?

1   A.   Yes.

2   Q.   Is that how the matter was handled?

3   A.   No.

4   Q.   Did you request that it be in an open session?

5   A.   Yes, I did.

6   Q.   There's a reference that you have a right to

7   counsel or representative of your choice present at the

8   meeting. Do you see that?

9   A.   Yes.

10   Q.   Did you bring anyone in that capacity to the

11   meeting?

12   A.   No, not at that time.

13   Q.   When you say "at that time," what does the

14   qualifier mean?

15   A.   I didn't have a lawyer at that time.

16   Q.   I appreciate that. Was the meeting therefore,

17   held in open session at your request?

18   A.   Yes.

19   Q.   And did anyone accompany you to the hearing?

20   A.   Yes.

21   Q.   Can you estimate how many people did so?

22   A.   There were about maybe ten to fifteen people.

23   Q.   Did you have some family members with you?

138

1   A.   Yes.

2   Q.   Did you have any town employees who accompanied

3   you?

4   A.   Yes.

5   Q.   Can you tell me, first of all, who from your

6   family went with you to the hearing?

7   A.   My mother and my fiance and my aunt and uncle.

8   Q.   Which town employees do you recall attending

9   with you?

10   A.   Robert Andrews, board of selectmen; Mr.

11   Blackmer, Bruce Blackmer from the fire department. There

12   was somebody from the water department, but they left.

13   There was a few town citizens there also.

14   Q.   At your request?

15   A.   No. They just came.

16   Q.   Did any of the people you have identified speak

17   at the meeting?

18   A.   Rhonda and Norman Bartlett came. And I don't

19   think anybody was allowed to speak.

20   Q.   I'll get to that meeting in a moment. But I'm

21   going to mark as an exhibit something that you referred

22   to earlier, so we can have it clear on the record.

23   (Document marked Exhibit No. 9 for Id.)

1   Q.   Earlier you mentioned there was a memorandum

2   concerning your leave without pay in November of 2000.

3   Is this that document?

4   A.   This is the one that was in my file that I saw,

5   but I never got a copy of this. If you look on the

6   memorandum, it says, where it says To, it says File. So

7   it went in my file without my knowledge.

8   Q.   Is that where you eventually saw it?

9   A.   Yes.

10   Q.   Now, did the meeting before the human resources

11   board, in fact, take place on November 14th?

12   A.   Yes, it did.

13   Q.   I'm going to hand you another document and ask

14   you some questions about it.

15   (Document marked Exhibit No. 10 for Id.)

16   Q.   Are you ready to talk about that document?

17   A.   Sure.

18   Q.   First of all, would you concur the document is

19   titled Human Resources Board for the Town of Orange

20   Meeting Minutes?

21   A.   Yes.

22   Q.   Do you see the date as November 20th, 2000?

23   A.   Yeah.

140

1   Q.   Does that refresh your memory or change your

2   testimony as to the date on which the meeting about your

3   suspension was held?

4   A.   Yeah.

5   Q.   Is it now your memory it took place on November

6   20th?

7   A.   Yes.

8   Q.   Do you know why the meeting didn't go forward

9   on November 14th as originally scheduled?

10   A.   Something happened and somebody wasn't going to

11   be there. I don't think they would have had enough

12   people to be there because they had -- No. This wasn't

13   the first human resource board meeting.

14   Q.   Okay. I'm just trying to learn it myself. I'm

15   not trying to mislead you.

16   A.   This is the second one. From the first one

17   they had ten days to do another meeting. This is the

18   second meeting.

19   Q.   All right. Then I appreciate that. And,

20   therefore, does it remain your memory your first meeting

21   before the human resources board was on the 14th of

22   November?

23   A.   Yes.

141

1    Q.    Was there, indeed, a second meeting before the
2  human resources board as reflected in the minutes marked
3  as Exhibit 10 on November 20th?
4    A.    Yes.
5    Q.    Can you tell me what your recollection is of
6  what transpired at the first meeting on November 14th?
7    A.    At the first meeting, basically we just told
8  each other's side of the story, and they were going to
9  come back with some kind of answer, and they had ten days
10  to do that.  According to the human resource bylaw, that
11  was pointed out by Mr. Andrews, and so that's why we
12  ended up coming back again, because basically this was
13  the decision of my suspension.
14      On the other meeting minutes, they allowed Mike to
15  do the meeting minutes, and he was also included as a
16  board member, which he's not a board member.  He sat up
17  front with them, at the table with them.  At this meeting
18  he didn't.  He sat in the audience like everybody else.
19    Q.    Do you have copies of the minutes of the
20  November 14th meeting?
21    A.    Yes, I do.
22      MR. TEHAN:  Off the record for a minute.
23      (Discussion off the record.)

142

1      MR. TEHAN:  Back on the record.
2    Q.    Miss Littlewood, how long did the meeting on
3  November 14th take?
4    A.    It was probably a good two hours.
5    Q.    When you indicated that certain family members
6  and town employees accompanied you, did they accompany
7  you to that first meeting?
8    A.    Yes.  Yes.  There was more at the second
9  meeting than there was the first meeting.
10    Q.    Did Mr. Racicot address the basis for his
11  suspension of you at the first meeting?
12    A.    Yes.
13    Q.    What did he say?
14    A.    He called me a liar, and he said that I was
15  yelling and screaming at him.  And, you know, it's really
16  kind of hard for me to recollect because I was, at this
17  point in time I was just a mess.  But some of the meeting
18  minutes, it's kind of hard to tell the meeting minutes
19  from the first one because he wrote them himself.  He put
20  in there what he wanted to put in there.  He put himself
21  down as a member of the board, so.
22    Q.    So it's your recollection that the minutes of
23  the human resources board for the meeting on

143

1  November 14th were actually prepared by Mr. Racicot?
2    A.    They were prepared by him.  He even signed down
3  the bottom.
4    Q.    Okay.  And is it fair to say that no decision
5  was reached at that meeting?
6    A.    Right.
7    Q.    Now, you made a reference to the fact that or
8  to a time frame of ten days.  Was it your understanding
9  under the human resource board bylaw that it had ten days
10  to make a decision from the date of hearing?
11    A.    Yes.  And we were also instructed that neither
12  one of us were to do anything, that the human resource
13  board was going to figure out and decipher and handle
14  things themselves.
15    Q.    When you say not do anything, what did you
16  understand that to mean?
17    A.    Not to call anybody, the state, call anybody
18  about it.  To let the human resource board handle it.
19  Because if you notice through all these memos, Mike's
20  name is on all of these.  Basically, you know, he was
21  supposed to stay out of it and the human resource board
22  is supposed to just take over everything.
23    Q.    By its bylaw, it was the body entrusted with

144

1  the appeal and review of your suspension by the town
2  administrator.  Correct?
3    A.    Yes.  Well, I was supposed to go to the board
4  of selectmen, and they turned around me and sent me to
5  the human resource.
6    Q.    Maybe I should state it differently.  In fact,
7  the human resource board was the town body that reviewed
8  and eventually rescinded the suspension of you by the
9  town administrator.  Correct?
10    A.    Yes.
11    Q.    I would like to go over with you the minutes
12  that were marked as Exhibit 10, if we could.  It says
13  that there were various visitors, approximately 23 in
14  number, on the second line.  Is that your memory of --
15    A.    There was quite a few people.
16    Q.    -- of the crowd?  How was the tone of the
17  meeting?  Was it an orderly meeting, was it a raucous
18  meeting?  Can you characterize it?
19    A.    It was orderly.
20    Q.    Who spoke at the second meeting?  Did you?
21    A.    I think it was more of discussions than spoke.
22    Q.    You had already given your version of events at
23  the prior meeting?

**149**

1    A.    I told him it wasn't mine, it wasn't anything

2    that I signed.

3    Q.    Have you ever learned where the job description

4    that he presented to the human resources board came from?

5    A.    Him.

6    Q.    I know that he presented it at the meeting.

7    And is it your testimony that, to the best of your

8    understanding, he was the one who actually typed up or

9    prepared the job description that was presented?

10    A.    Yes.

11    Q.    Has he ever admitted to doing that?

12    A.    No.

13    Q.    Has anyone ever told you he admitted doing so

14    to them?

15    A.    Not that I know of.

16    Q.    You just don't know where else it would have

17    come from?

18    A.    Right.  Because we had one in our assessors'

19    file that was totally different than the one he presented

20    to the board.

21    Q.    Did you sign two job descriptions?

22    A.    No.

23    Q.    You're clear on that?

**150**

1    A.    Yes.

2    Q.    It says, "The chairman allowed several

3    questions and comments from the visitors."  We may have

4    been over this, but do you recall what those questions or

5    comments may have been?

6    A.    I don't recall.

7    Q.    Was there discussion at the November 20th

8    meeting about who it was who really supervised you?

9    A.    Yes.

10    Q.    And is it fair to say that that was an unclear

11    issue as the board discussed it that evening?

12    A.    The board kind of made it an unclear issue.

13    Q.    Meaning what, Ma'am?

14    A.    It was kind of totally blown up.  And basically

15    what was happening was it wasn't about my suspension

16    anymore.  It was about who my supervisor was.  That's not

17    what we were there for.  What we were there for was my

18    suspension.

19    Q.    I appreciate that, but, indeed, it morphed, it

20    got into a discussion of supervision, the meeting did?

21    A.    Yes.  That's what the letters were about.

22    Q.    What letters, Ma'am?

23    A.    The ones you had mentioned previously.

**151**

1    Q.    The DOR letter?

2    A.    Yes.

3    Q.    Did you make a request to see your personnel

4    file at that point?

5    A.    Yes, I did.

6    Q.    Did Mr. Racicot and Mr. Pond bring it back?

7    A.    Yes, they did.

8    Q.    Did you raise an issue about your discovery of

9    the suspension letter being placed in your personnel

10    file?

11    A.    The personnel law says that if you have

12    something, that you are supposed to sign it before it

13    goes into your personnel file.  The day after I got

14    suspended, the only thing that was in my file was a good

15    review, the outstanding review we had previously talked

16    about.  At this meeting when I did get my personnel file,

17    there was numerous things, things that, you know,

18    exhibits that you have had appear that were put in my

19    file.

20    Q.    And did you raise your concern that was not

21    appropriate at the HRB meeting?

22    A.    Yes.

23    Q.    Did you know the law, at least you believed you

**152**

1    knew the law at that point at that time?

2    A.    Yes.  I did.  That's why I requested my file.

3    Q.    Ultimately was a motion made, seconded and

4    approved by the human resources board to rescind your

5    three-day suspension and to reinstate your pay?

6    A.    Yes.

7    Q.    And did that happen?

8    A.    Yes.

9    Q.    Did you suffer any pecuniary loss as a result

10    of the suspension, monetary loss, post the action on

11    November 20th?

12    A.    No.

13    Q.    There's a discussion that you requested to take

14    your file?

15    A.    That was when I requested a copy of my

16    personnel file.

17    Q.    It says the request was denied.

18    A.    Yes.

19    Q.    By whom?

20    A.    The board.  Joe Hawkins said no, whatever.

21    Q.    Now, there's a reference in these minutes that

22    the other two assessors, Mr. Adam -- that's Mr. Adam who

23    was an assessor, correct?

157

1 resource board we were very disappointed to learn that
2 the town administer did not consult or even advise the
3 board of selectmen prior to taking the action against the
4 assessors' clerk." Did I read that accurately?
5     A.   Yes.
6     Q.   Is it your understanding as you sit here today
7 that Mr. Racicot's suspension of you was something he
8 undertook without having previously consulted with the
9 board of selectmen?
10    A.   Yes, it is.
11    Q.   How did you come to that knowledge?
12    A.   Because, because I called Mr. Reppas and I
13 called Mr. Andrews, and neither one had known about it.
14    Q.   There's a statement here, "In closing, it is
15 the opinion of the board of assessors that the town
16 administrator harassed the assessors' clerk as a board
17 member." What did it mean to you when you signed this,
18 harassed the assessor's clerk as a board member? What
19 did you mean by that statement?
20    A.   He never contacted any of the other members.
21 The only one that he caused any trouble to was me,
22 wanting me to sign it.
23    Q.   I understand your position. Maybe it's just

158

1 grammar and I'm not getting it right. Harassed
2 assessors' clerk as a board member, what did that phrase
3 mean at the time you signed it? What does it mean to
4 harass a clerk as a board member?
5     A.   Trying to make me sign that recap sheet. He
6 never called any of the board members. He never called
7 any of the other board members to sign that recap sheet.
8 I gave him every option to do so. And I wished him,
9 please do so. He still never did. And he didn't return
10 any of their phone calls.
11    Q.   I want to take you up on than last point. Do
12 you have knowledge as you sit here that any other
13 assessor than yourself made an affirmative effort to
14 discuss the recap sheet with Mr. Racicot?
15    A.   No.
16    Q.   So what phone calls did he not return?
17    A.   After I got suspended, he didn't return any of
18 their phone calls.
19    Q.   The phone calls pertaining to the suspension?
20    A.   Yes.
21    Q.   Who called Mr. Racicot in that regard?
22    A.   Norman Bartlett and Steve Adam.
23         (Document marked Exhibit No. 14 for Id.)

159

1     A.   Well, that's a lie.
2     Q.   I have placed in front of you a two-page
3 exhibit marked Exhibit 14 which is a memo to the board of
4 selectmen from Mr. Racicot dated December 5th, 2000.
5 Have you ever seen this document before?
6     A.   Yes.
7     Q.   I wanted to review some of the issues set forth
8 in it with you. Did you ever lie to Mr. Racicot about
9 the status of the preparation of the recap sheet?
10    A.   No, I did not.
11    Q.   Did you ever tell him it was completed or near
12 completed when that wasn't the case?
13    A.   The only thing that was missing was the
14 assessors' signature. As far as this missing paperwork
15 and everything else, I don't know what he's talking
16 about.
17    Q.   Let me get to that. There's a reference here
18 to deliberate delays. Did you deliberately delay your
19 preparation of the recap sheet for any purpose?
20    A.   No, I did not.
21    Q.   Did any of the assessors suggest to you or
22 direct you to delay the preparation of that paperwork?
23    A.   No, they did not.

160

1     Q.   In the second paragraph Mr. Racicot writes
2 "papers were missing." Are you aware of any papers that
3 were missing from the packet when you presented it to him
4 on October 13th, 2000?
5     A.   No.
6     Q.   Is it your position that no papers were
7 missing?
8     A.   Yes.
9     Q.   There's a reference to the fact that numbers
10 were wrong. I know you didn't write this, but do you
11 believe that would make reference to the error of the
12 accountant?
13    A.   That one page. Yes.
14    Q.   It states, "The documents which should and
15 would have been signed by other officials were never
16 circulated." Do you know to what that statement refers?
17    A.   No. Each office gets a copy of the recap
18 sheet, and they fill out their pages, they do their pages
19 and then bring them into me, and then the assessors go
20 through them and then send them out. So it's not my,
21 it's not my job to distribute these pages because
22 everybody got a floppy disk with the recap sheet on it
23 sent to each department and then they do their pages.

181

1    Q.   When you saw that in the paper, was that the
2    straw that broke the camel's back for you?
3        A.   Yes.
4        Q.   Has anyone told you that Mike Racicot told them
5    that the reason he suspended you was because in your role
6    as an assessor you had not signed the recap sheet?
7        A.   He told me that.
8        Q.   I'll get to that in a minute. Please answer my
9    question.
10       A.   Not to my recollection.
11       Q.   When you say he told you that, that's when you
12   earlier testified he said something to the effect of "so
13   you won't sign this, here's a suspension letter"?
14       A.   Yes. And what he was holding, he was holding a
15   recap sheet with signature tabs sticking out where the
16   assessors were supposed to sign. And he already had that
17   suspension letter before he even went to the finance team
18   meeting because he never went back to his office. He
19   knew what he was doing before he went to that meeting.
20       Q.   You're saying you and he went directly to the
21   area near the elevator from the meeting without him going
22   to his own office?
23       A.   Yes.

182

1        Q.   You have a sex discrimination claim in this
2    case under Chapter 151B. Are you aware of that?
3        A.   Yes.
4        Q.   Do I understand correctly that was initially
5    presented to the Massachusetts Commission Against
6    Discrimination but dismissed from that body?
7        A.   Yes.
8        Q.   What is the basis factually to you as a
9    layperson for that claim in this case?
10       A.   Because he didn't go to the other two members
11   of the board.
12       Q.   It may be obvious, but please agree if it's
13   true. That neither of those members served as the clerk.
14   Is that true?
15       A.   Right. But what we're talking about really
16   doesn't have anything to do with the clerk at all.
17       Q.   I understand that's your position. You have a
18   claim that your rights to equal protection under the law
19   were violated. I recognize that you're not an attorney,
20   but let me ask you this. Whom do you contend you were
21   treated differently than? Is it the other two assessors?
22       A.   Differently than? Differently than anybody
23   else.

183

1        Q.   Well, there was only one assessors' clerk,
2    right?
3        A.   Yes.
4        Q.   Your position is that Mr. Racicot raised with
5    you the issue of the recap sheet, but never discussed it
6    with the other two assessors. Is that correct?
7        A.   That's correct. And he never returned their
8    call.
9        Q.   You feel you were treated differently than the
10   other two assessors in that regard. Is that correct?
11       A.   Yes.
12       Q.   You have a claim that Mr. Racicot intentionally
13   interfered with an advantageous relationship that you had
14   with your employer, Town of Orange. Are you aware of
15   that?
16       A.   Yes.
17       Q.   Apart from his suspending you, is there
18   anything else that you contend that he did that interfered
19   with your working relationship with the town?
20       A.   Yes. All right here in these memos.
21       Q.   You're referring to what?
22       A.   To the whole thing about who my, who I'm
23   supposed to speak to, who -- Everything. Everything. I

184

1    mean, this was a continual thing.
2        Q.   Tell me again, who is Dot Ruby, what did she
3    do?
4        A.   She was on the finance committee.
5        Q.   When you said a minute ago it's the whole
6    thing, you're referring to all the exhibits I have given
7    you. Correct?
8        A.   Yes.
9        Q.   Indeed, we have established that Mr. Racicot
10   served you with a notice of suspension, right?
11       A.   Um-hmm. And it wasn't just him. It's the
12   whole town, the Town of Orange. They could have put a
13   stop to this at any time. I shouldn't be called by the
14   board of selectmen and be advised of what I should do,
15   and then turn around and have them not do anything to
16   help. Or to set things right as they're saying it should
17   be.
18       Q.   At what point could the selectmen have done
19   something?
20       A.   They could have done something at any
21   They could have done something at any poin'
22   Reppas could have done something at a
23   what was going on. He had had fights wi

189

1    **A.**  Yes.

2    **Q.**  That you had requested be public.  Correct?

3    **A.**  Yes.  And it's right in the meeting minutes

4    that he wrote.

5    **Q.**  Is there any other comment of his that he's

6    made about you that you considered to be defamatory?

7    **A.**  I would say that set of meeting minutes because

8    there's other things in there.  I can't really recall

9    what they are right now, but there's other things that he

10   had wrote that were not true.

11   **Q.**  So the --

12   **A.**  They were put in there for his benefit.

13   **Q.**  I appreciate your comment.  Bear with me.  Your

14   testimony today is that at the first meeting of the human

15   resource board on November 14th, 2000, Mr. Racicot called

16   you a liar?

17   **A.**  Yeah.  He's called me one throughout this whole

18   thing.

19   **Q.**  But that's one time you recall his doing it?

20   **A.**  Yep.

21   **Q.**  Okay.  And it's your understanding that he

22   actually prepared the minutes of the November 14th --

23   **A.**  No.  He did.  Because he signed his name to

190

1    them.

2    **Q.**  Okay.  Well, then it is your understanding?

3    **A.**  Yes.

4    **Q.**  I just don't have them in front of me.  That's

5    why I phrase it that way.  It's your testimony that

6    certain statements of those minutes are defamatory to

7    you?

8    **A.**  Correct.

9    **Q.**  You have indicated that the minutes refer to

10   you as a liar again?

11   **A.**  Yes.

12   **Q.**  Anything else in them that you recall?

13   **A.**  Not that I recall.

14   **Q.**  Has anyone come to you and suggested to you

15   that they think you're a dishonest person or a liar as a

16   result of anything Mike Racicot said?

17   **A.**  Only the way I have been treated.

18   **Q.**  Well, I appreciate that, but please answer my

19   question.  It was direct.  Has anyone told you that they

20   considered you dishonest or a liar based on anything Mike

21   Racicot said?

22   **A.**  No.

23   **Q.**  Do you contend you have suffered emotional

191

1    distress as the result of Mr. Racicot's actions towards

2    you?

3    **A.**  Yes.

4    **Q.**  How has that emotional distress manifested

5    itself?  What symptoms have you suffered?

6    **A.**  I used to get headaches, I used to grind my

7    teeth at night, loss of sleep, not being able to eat.

8    **Q.**  When did those conditions begin?

9    **A.**  When this started.

10   **Q.**  When did it start?

11   **A.**  October.

12   **Q.**  And have those symptoms improved with the

13   passage of time?

14   **A.**  Somewhat.

15   **Q.**  Did you ever grind your teeth or have eating

16   issues for whatever reason before October of 2000?

17   **A.**  No.

18   **Q.**  Now, have you taken any mental health therapy

19   as a result of the stress you're claiming in this case?

20   **A.**  No.

21   **Q.**  Have you taken any medications aimed at your

22   mood or mental state since October of 2000?

23   **A.**  No.

192

1    **Q.**  Same question prior to that date.  I'll be

2    clear.

3    **A.**  No.

4    **Q.**  Okay.  Had you taken any mental health therapy

5    before October of 2000?

6    **A.**  No.

7    **Q.**  Or any drugs aimed at your emotional state?

8    **A.**  No.

9    **Q.**  Okay.

10   MR. TEHAN:  Off the record.

11   (Discussion off the record.)

12   **Q.**  Apart from the claims we have discussed against

13   Mr. Racicot in this case, Count 5 of the complaint

14   states, "The defendant, Town of Orange, and/or agents or

15   employees of the Town of Orange were negligent and,

16   therefore, are liable to the plaintiff for damages."  I

17   wanted to pursue that issue with you.

18   Off the record.

19   (Discussion off the record.)

20   **Q.**  In your answer to Interrogatory Number 17, you

21   were responding, I believe, to a question about that part

22   of the complaint that I just read into the record.  Do

23   you see that?

194

1    **A.**   Yep.

2    **Q.**   In your answer you indicate that Orange was

3    negligent in not having a clear grievance process. Do

4    you see that?

195

1    **A.**   Yes, I am.

2    **Q.**   I'm sorry, I don't quite follow you. What did

3    you mean by that comment?

193

1    A.    Yep.

2    Q.    In your answer you indicate that Orange was

3  negligent in not having a clear grievance process.  Do

4  you see that?

5    A.    Yep.

6    Q.    And have we discussed that in terms of it being

7  unclear as to whether the matter went to the selectmen or

8  human resource board?

9    A.    No.

10    Q.    What are you referring to there?

11    A.    What I'm referring to there is there was a

12  grievance policy in place and it wasn't used.

13    Q.    What did the grievance policy, as you

14  understood it, at that time dictate?

15    A.    The grievance policy said go to your department

16  head.  If you get satisfaction from your department head,

17  then you need to go to the human resource board, not skip

18  your department head and go to the human resource board.

19    Q.    Who was your department head?

20    A.    Well, I was trying to get on the agenda for the

21  board of selectmen because it came from the town

22  administrator.  The only one that is above the town

23  administrator is the board of selectmen.

194

1    Q.    When you say "it" you're referring to the

2  suspension?

3    A.    Yes.

4    Q.    Then your next claim flows from that that town

5  officials weren't trained to follow that process?

6    A.    Right.  I have a fax from the town

7  administrator's office saying that there is no written

8  grievance policy, that it's only verbal.  But I got a

9  copy of it, but they didn't have one.  And at the human

10  resource board meetings they said they would get a copy.

11  So we requested a copy, and, guess what, they didn't even

12  have one.

13    Q.    Having said all that, the fact remains, does it

14  not, that the actions that you wanted taken, the recision

15  of your suspension and the return of pay you had lost,

16  were provided to you by the human resource board.

17  Correct?

18    A.    Yes.  But if I could give up this whole sheet

19  right here, I would give it all back.

20    Q.    I don't know what you mean.

21    A.    If I could take away all this stuff, I would

22  give them back my pay and take my suspension.

23    Q.    You're referring to the exhibits we have used?

195

1    A.    Yes, I am.

2    Q.    I'm sorry, I don't quite follow you.  What did

3  you mean by that comment?

4    A.    If I were to not have to go through this, I

5  would have taken my suspension and not taken my pay.  If

6  I knew I was going to have to go through all this.

7    Q.    You indicate it was negligent as well that the

8  duties of the assessors' clerk were not clear.  Do you

9  see that, Number 5?

10    A.    Yes.

11    Q.    We have spoken at some length about supervisory

12  issues as to the duties of the clerk?

13    A.    Right.

14    Q.    I'll say it again.  We have spoken at some

15  length at the deposition concerning the issue of who

16  supervised you.  Correct?

17    A.    Right.

18    Q.    Is there, therefore, something unclear to

19  you --

20    A.    I know who I was working for.

21    Q.    I understand that.  But in this answer you have

22  indicated your duties.  Was there any ambiguity in your

23  mind as to what your job was?

196

1    A.    No.  None at all.  It wasn't my job.  It's who

2  I was supposed to speak to.

3    Q.    Or report to?

4    A.    Right.  They didn't have a clue.  The town

5  didn't have a clue.

6    Q.    But your job duties, quote unquote, were clear

7  to you at all times?

8    A.    Yes.

9         MR. TEHAN:  Off the record for a minute.

10         (Discussion off the record.)

11         MR. TEHAN:  Back on the record, please.

12    Q.    Upon your return from suspension, did you have

13  a discussion with Mr. Racicot?

14    A.    Yes.

15    Q.    Did he suggest in that discussion you two ought

16  to start over, or words to that effect?

17    A.    Yes.

18    Q.    What was your response?

19    A.    I told him that it might be over for him, but

20  it's not over for me.

21    Q.    What did he say to that?

22    A.    I don't recall.

23    Q.    Do you remember anything else about that

# Miniscript and Word Index

SHARI LITTLEWOOD

VS

MICHAEL RACICOT, ET AL

DEPOSITION OF

MICHAEL RACICOT

OCTOBER 15, 2004

*Leavitt Reporting, Inc.*
*1207 Commercial Street, Rear, Weymouth, MA 02189*
*781-335-6791*

**37**

1    A. The issue we are in this room today discussing is
2  because Miss Littlewood never produced the forms.
3    Q. Going back to this conversation, after
4  Miss Littlewood stated that she and the other members of
5  the Board of Assessors would not sign the recapitulation
6  sheets because of this issue, did you, did that concern
7  you about the other members as well as Miss Littlewood?
8    A. My concern was for the financial well-being of the
9  community. My concern was that those forms needed to be
10 submitted to the state in order to certify our tax rate.
11   Q. What was the deadline for the certification that
12 they had to be submitted?
13   A. There is really no deadline.
14   Q. Were you employed by the Town of Orange during,
15 this was in -- I'm sorry, let me start over.
16        You were employed by the Town of Orange in
17 2000, right?
18   A. Yes.
19   Q. And so this was the first tax recapitulation sheet
20 that you were submitting under your watch so to speak?
21   A. It was the second.
22   Q. It was the second. The first was when?
23   A. 1999. Calendar year 1999.

**38**

1    Q. And do you remember when that was submitted, what
2  date?
3    A. I'm not sure.
4    Q. Who prepared that?
5    A. The town accountant working with Miss Littlewood.
6    Q. And was there any delay in preparing that sheet?
7    A. It went in late I remember that but I'm not, I
8  can't, I don't know the particulars.
9    Q. You said there was no deadline, so what do you
10 mean by it went in late?
11   A. There's no specific deadline. Well, I guess there
12 probably is. You can't submit it after the beginning of
13 the year. There's a deadline in that the State wants you
14 to do it as soon as possible so they have time to review
15 it and get back to you, and then it's a month process in
16 order to issue the bills, so there's a deadline in that in
17 order to keep the cash flow of the community going, you
18 want to get the bills out as soon as possible, and also to
19 allow taxpayers to use it as a deduction on their income
20 tax for the current year, so everyone tries to issue the
21 bills in November.
22   Q. In November?
23   A. Tries.

**39**

1    Q. Okay. And in 1999 when did the bills issue?
2    A. Sometime in the middle to end of October -- oh,
3  the bills themselves or these papers? The bills are
4  different from the state certifying the tax rate.
5    Q. I understand but you just said that you wanted the
6  bills to go out in November. The tax bills I'm assuming
7  you're referring to?
8    A. Correct.
9    Q. In 1999 when did the tax bills go out?
10   A. I'm not sure.
11   Q. In 2001 when did the tax bills go out?
12   A. I was no longer employed by the Town of Orange in
13 2001.
14   Q. And in 2000, when did the tax bills end up going
15 out?
16   A. Probably November.
17   Q. After the discussion with Miss Littlewood where
18 she explained to you that, why the Board of Assessors was
19 not going to sign the recapitulation sheet, when is the
20 next discussion you had with her about the issue of the
21 investigation into the ambulance fund?
22        MR. TEHAN: Well, I'll object. I take your
23 question for what it is, but if you don't mind my pressing

**40**

1  for a clarification, that would be as opposed to
2  discussions about the recap sheets?
3        MS. CARRITHERS: Yes.
4        MR. TEHAN: Okay, if you can follow that.
5    A. Miss Littlewood brought it up on the Friday that
6  when she was suspended for not preparing the sheets.
7    Q. And do you remember the date that was?
8    A. That one... October 13, 14.
9    Q. And what was her -- you said she brought it up.
10 What was her comment, what was her statement?
11   A. She was very emotional because she was trying to
12 equate the fact that she was being suspended with the fact
13 that she was refusing to sign recapitulation sheets.
14   Q. And what did she say?
15   A. She had, in the beginning she said "You're
16 suspending me because I won't sign these sheets?" I told
17 her no, because she had failed in her duties as a clerk to
18 prepare the sheets. That I, were they prepared, I would
19 see that they got signatures on them, but at no time was
20 this about her signing the sheets.
21   Q. When did you first ask her to prepare the
22 recapitulation sheets?
23   A. I suspended her on a Friday. We had had a

Case Compress

**41**

1  discussion weeks before with town accountant present,
2  asked, saying the last step in the process to submit a
3  recap is for the Board of Assessors to meet with the
4  selectmen and make a recommendation on classification
5  factor. Once that meeting is held and the Board of
6  Selectmen, whether they take the assessors' recommendation
7  or not, votes on a classification factor, then the recap,
8  that's the end of the recap sheet. All of the documents
9  should be ready to go. So I wanted, I had talked to her
10  with the town accountant as to whether those sheets were
11  going to be ready. At that time she told me they were.
12  This was two, at least two weeks before. I spoke to her,
13  we held the tax classification --
14      Q. Go ahead.
15      A. I'm finishing my answer.
16          MR. TEHAN: She isn't stopping you. Go
17  ahead.
18      A. We held the tax classification, the Board of
19  Selectmen affirmed their vote at that point so the next
20  morning the factor was done. I waited -- that was a, that
21  was Wednesday or Thursday. I waited until Monday and
22  asked her if she had completed the paperwork to be sent in
23  to the State. She told me, there was a pause in the

**42**

1  office and then she said she had completed them.
2          So I went back to my office down the hall,
3  and a few moments later the treasurer who shares an office
4  with Miss Littlewood came in and said to me "Did you
5  notice there was a pause?" She said "You'd better check
6  on that." So I did. When I went back, I learned that the
7  papers hadn't been prepared. So I asked the next day and
8  I was told they were all done and they were just waiting
9  for some signatures.
10         The next day I was still, I was told they
11  were done, and then finally on Thursday when I asked
12  again, I said, "The papers will be on my desk tonight
13  before you leave." And when I went down at four o'clock,
14  she had left a little bit early, the papers were not on my
15  desk. So it was that Friday morning when I went in to her
16  office at 8:45 and I said, "where are the papers?" We
17  *start at 8. "where are the papers?" And without looking*
18  *at me, she pointed to her inbox.*
19         So I took the papers and I went to the town
20  accountant, and that's when I learned that there were
21  several that weren't ready, that she hadn't distributed
22  them to the town clerk or to, she hadn't given me a sheet
23  that the Board of Selectmen were supposed to sign, so they

**43**

1  weren't complete. So I went back to her and confronted
2  her on the fact that she had been telling me all along
3  that she did it but they weren't ready, and that's when
4  she raised the issue that it was because she hadn't signed
5  them, and I made it very clear that that had nothing to do
6  with it.
7      Q. Where were you physically when you actually
8  suspended her?
9      A. Because of the layout of the Orange Town Hall,
10  there's really no good place to have any privacy. So
11  basically in situations, discipline situations in order to
12  protect the employee's privacy, the only place we had was
13  there's an elevator lobby off of the Board of Selectmen's
14  meeting room, so that's where I went with Miss Littlewood
15  and other employees when we had something to discuss of a
16  disciplinary nature.
17      Q. You don't have an office, is that what you're
18  saying?
19      A. The office for the town administrator is a big
20  room and the administrative assistant sits in that room.
21  There's no privacy.
22      Q. Unless you ask, you could have asked --
23      A. At the time I worked there --

**44**

1      Q. You could have asked the administrative assistant
2  to step out, couldn't you?
3      A. I've done that on occasion. I did not do it in
4  this instance.
5      Q. Was there a meeting, some sort of financial
6  meeting that preceded your suspension, any discussion
7  about the suspension?
8      A. The first discussion was over the recap sheets. I
9  met with her, it was very emotional on her part, and so I
10  hadn't made any decision on what I was going to do at that
11  time with the fact that she had been telling me she
12  completed work which she didn't. So I convened a meeting,
13  we had a regular monthly meeting, the finance team, which
14  involved all of the different departments related to the
15  finances of the community where we covered every issue
16  that related to the finance of the community. We went to
17  *that meeting.*
18      Q. And that preceded when you actually handed her,
19  physically handed her the suspension?
20      A. Yes, that's correct.
21      Q. When did you prepare the notice of suspension?
22      A. After the first meeting when I had gotten back to
23  my office.

45

1    Q. Could you identify what you mean by the first
2  meeting?
3    A. The first meeting with Miss Littlewood where I
4  confronted her with my displeasure over the fact that she
5  never completed the paperwork.
6         MR. TEHAN: Would you excuse me, ma'am, if I
7  could just try to clarify something if you don't mind.
8         MS. CARRITHERS: Sure.
9         MR. TEHAN: When you say first meeting, was
10  it the first meeting with her on the day she was actually
11  suspended?
12         THE WITNESS: Yes.
13         MR. TEHAN: Okay, thank you.
14    Q. So you had an initial meeting with her?
15    A. (Nods head.)
16         MR. TEHAN: Yes or no, sir?
17    A. Yes.
18    Q. And then you had the finance meeting?
19    A. Yes.
20    Q. And then you had a second meeting?
21    A. Yes.
22    Q. Why did you have two meetings with her?
23    A. I had not made a decision in my mind as to whether

46

1  I was going to suspend Miss Littlewood or not for her
2  failure to complete the work and her failure to do it in a
3  timely fashion. I went back, I did fill out a suspension
4  notice, but I hadn't made up my mind at that point that I
5  was going to serve it on her.
6         When we went to the finance team meeting and
7  when the subject got around to, you know, cash flow and
8  taxes and she began to berate me in front of the other
9  employees, that solidified my decision that I was going to
10  suspend her for insubordination.
11    Q. And how did she berate you?
12    A. She raised her voice. She was yelling at me,
13  telling the town administrator how to act. That she
14  didn't have to answer to anyone.
15    Q. What specifically did she say if you can remember?
16    A. I don't remember.
17         MS. CARRITHERS: I need a little bit of a
18  break.
19         MR. TEHAN: Yes, let's go off the record.
20         (Discussion held off the record.)
21         (Lunch recess taken at 12:30 p.m.)
22
23

47

1         AFTERNOON SESSION
2         (Back on the record at 1:17 p.m.)
3    Q. I want to go back a little bit to the decision to
4  redirect the financing for the Finance Committee.
5    A. Okay.
6    Q. What is -- or not the Finance Committee, the
7  ambulance.
8    A. Okay.
9    Q. I'm waking up. Give me a minute. What was the
10  advantage of doing it?
11    A. It takes it off the general fund budget so that it
12  no longer comes out, it's no longer coming out of the same
13  pool of school funds and the general government is being
14  run on. It puts it just like you do with the water and
15  sewer; it only funds that, it funds that function. So
16  that's the advantage of it. It's out of, it would no
17  longer be in a consideration of taxes for example. You
18  wouldn't be raising taxes to fund it any more after that
19  first year. From that point on, it's off. It's not even
20  in the tax pool after the first year.
21    Q. But the first year you'd raise taxes?
22    A. Well, in the first year you're redirecting the
23  funds that it's generating. It's more, you know,

48

1  basically we had to have -- this isn't the exact number
2  because I don't have it in front of me. We had to have
3  say -- I'm using this as an example -- we had to have $10
4  million to fund everything that Town Meeting voted for,
5  and so to get that $10 million we have to have, the way it
6  was set up originally say 100,000 is going to come from
7  this fund and we're going to get 10,000 from that fund and
8  we're going to get 15,000 from cemetery funds and all
9  these add up to $10,000. So now what we're doing --
10    Q. The $10,000 is in the general fund?
11    A. No, that's the whole budget overall. And then so
12  we've got, we've got to have $10 million. So to get that
13  $10 million we moved it around amongst all these different
14  funds, revenue sources, and one of the revenue sources is
15  $168,000 that the ambulance generated last year so we're
16  projecting that it's going to generate that much this
17  year, and, but of that 168,000, we're going to spend 90 of
18  it to run the ambulance. So that's, that's what we got.
19         So now what happens is, well, by doing the
20  statutory change, and I really want to make it clear that
21  this is not my proposal. This was the town accountant who
22  came to me and asked me to bring it to the Board of
23  Selectmen. So that's what it is. She said you can change

**49**

```
1   it by statute, and I don't know the numbers of it, it's
2   one of the financial statutes, there are a bunch of them,
3   Chapter 41 I think it is, that allow you to do this just
4   like they allow you to do water and sewer enterprise
5   funds. Now, whatever the ambulance takes in, the
6   ambulance will not take any money from the general fund
7   from taxes any more. It will only take those from the
8   fees that it generates.
9        What we were trying to do, right now the
10  ambulance is costing us $90,000 to run at the time I
11  worked there. What we were also in the middle of, at the
12  same time all of this took place was we had an ambulance
13  task force and we were looking at the reality of the
14  possibility of hiring four more paramedics, EMT's and
15  increasing our ambulance. So that was, what that was
16  going to mean is we were going to be paying more for our
17  ambulance service in Orange.
18       The feeling was, and this is why the
19  accountant came to me, if we take it off budget away from
20  the general fund, then we can use those fees to pay for
21  the extra people that we're going to be using; in other
22  words, it will no longer be on the, in the general fund,
23  it will no longer be a part of what we raise in taxes, but
```

**50**

```
1   for the first year, yes, the difference because we were
2   using it as; in other words, we were supplementing the
3   rest of perhaps it was the school, perhaps it was
4   something else, we were supplementing other areas of the
5   budget by using ambulance fees because there was a $78,000
6   profit in there; in other words, we weren't spending as
7   much as we were taking in.
8        So yes, for that first year you were going
9   to have to make up that $78,000 somewhere else but the
10  Town of Orange was undertaking. There's what's called a
11  tax levy. They undertaxed what they could tax by almost
12  $200,000. So we were going to make up that. We weren't
13  going to make up the whole. And the assessors just didn't
14  understand that. They didn't realize that you were, that
15  yes, you were taking it out but you weren't taking it all
16  out because we had to pay for the ambulance anyway, so you
17  would be taking the 90,000 back off the tax roles for that
18  first year but every year after that then it was gone.
19       I mean this is why Mrs. Bittenbender was an
20  outstanding accountant, she was one of the best I've ever
21  worked with in this whole state in 27 years, and this was
22  a long term and that's why she processed it and it made a
23  lot of sense, but for whatever reason not everyone
```

**51**

```
1   understood it.
2        Q. I'm not understanding it.
3        A. Okay, and I'm not surprised.
4        Q. I'm still confused. I mean I understand what
5   you're saying. I understand the mechanism. I don't
6   understand the benefit. Why not just increase the
7   expenses of the ambulance service in general fund? I mean
8   I don't understand why taking it out as a separate fund is
9   a benefit.
10       A. Well, I guess because ambulance funds can be
11  changed. You can raise rates on an ambulance fund. When
12  you're taxing, you're limited. You can only raise taxes
13  to the levy limit. Orange was quite a bit below the levy
14  limit. As I said, they were $200,000 below. I just did
15  Rockport whose budget is twice, where I work now twice the
16  size of Orange and we tax within $16,000 of our limit.
17       Q. But doesn't that have to be approved by a Town
18  Meeting?
19       A. No.
20       Q. The increase in --
21       A. Town Meeting votes on what they want to spend, and
22  then it's up to us to figure out how much, how much is
23  that, what's that going to do to the tax rate, and that's
```

**52**

```
1   what the tax recap is and that's why it goes to the State
2   is how much -- in other words, you've got your $10 million
3   budget, okay, we've got $2 million in other fees to put
4   towards that budget, and Orange got so much in state aid
5   it was outrageous, so, but what happened is now you're
6   saying okay, but we still have to raise 6 million in
7   taxes. So if you take away 168,000 of the other say $4
8   million in fees, yes, that means that you've got to raise
9   that in taxes but that's an internal thing. That's not,
10  that really isn't, statutorily it is not required to go to
11  Town Meeting. And that's where we were operating from.
12  It's a decision of the Board of Selectmen.
13       Q. So what you're saying is statutorily it's not up
14  to the Town Meeting, you don't have to, a raise in tax
15  rates does not have to be submitted to a Town Meeting?
16       A. Town Meeting does not decide the tax rate,
17  correct.
18       Q. And do you have any idea what statute you relied
19  on?
20       A. It's in the financial statutes, Chapter 41. I'm
21  not sure exactly. I would have to look it up. Doris
22  Bittenbender would probably know it off the top of her
23  head.
```

57

1    A. It provides a dedicated revenue stream so that we
2 can make the changes without having to affect the tax rate
3 after the first year.
4    Q. How much would it have affected the tax rate the
5 first year?
6    A. Probably 30 cents, 31 cents.
7    Q. On a thousand dollars?
8    A. (Nods head.)
9        MR. TEHAN: Yes?
10    A. Yes, on a thousand dollars.
11    Q. But that was a raise in the tax rate?
12    A. It was a change in the tax rate, yes.
13    Q. A change upward though? I mean you can't say it's
14 downward?
15    A. I didn't say that.
16    Q. Okay. What background if any do you have in
17 accounting?
18    A. What background do I have in accounting?
19    Q. Yes.
20    A. I've taken accounting courses in the course of the
21 various degrees I've gotten. I've had years of
22 experience.
23    Q. Going back to the two meetings I believe you said

58

1 on a Friday in October --
2    A. Okay, sure.
3    Q. -- with Miss Littlewood --
4    A. Mm-hmm.
5    Q. Forgive me, I'm probably going to repeat myself a
6 little bit, but just to get back up to speed, you stated
7 that she gave you the documents you requested but they
8 were not complete?
9    A. That's correct.
10    Q. What was not complete?
11    A. There were several schedules missing and she
12 hadn't circulated them amongst the necessary people to
13 have them signed.
14    Q. Who were the necessary people to have them signed?
15    A. She hadn't given me the copy that I would have
16 needed to have the Board of Selectmen sign. There were a
17 couple that she hadn't given to the town accountant to
18 sign and she hadn't given them to the town clerk who had
19 to sign.
20    Q. During either of these two meetings with Miss
21 Littlewood, did you try to explain where she was wrong in
22 her misgivings about the dedication of the ambulance fund?
23    A. No, that isn't what these meetings, that had

59

1 nothing to do with the discipline. I mean it had
2 something to do in that she hadn't done it, but I mean
3 when I talked to her it was the fact that she hadn't
4 completed the papers. There's no way for me to get
5 signatures or to submit anything until she did her part as
6 a clerk.
7    Q. Okay. If you know, why didn't Miss Littlewood
8 complete the paperwork as requested?
9    A. If I know --
10    Q. Yes.
11    A. -- why she didn't complete it? I'm assuming she
12 was taking her position as clerk and using it to prevent
13 something that she didn't want to see happen in her
14 elected position.
15    Q. When you say she didn't want to see it happen in
16 her elected position, what do you mean by that?
17    A. She had expressed, when she came to see me before
18 the discipline, that she didn't agree with the accounting
19 change. So I had to assume that in her dual role she was,
20 by not completing the paperwork, there's obviously no way
21 that it can be, that anyone is going to be able to sign.
22    Q. So this was a result of her position on the, her
23 refusing to do it was a result of her position on the

60

1 redirecting of the financing, is that what you're
2 claiming?
3        MR. TEHAN: Well, I'll object. He's not
4 claiming anything. He gave an assumption in response to a
5 question. I don't think she ever told him that or
6 admitted it. That's the basis for my objection. You can
7 go ahead.
8    A. I answered you.
9    Q. Let's go to the normal process in Orange of
10 disciplining employees. Could you describe what your
11 understanding is while you were there of the process of
12 disciplining employees?
13    A. Well, I mean I can only tell you my own
14 experience. I can only tell you how I disciplined
15 employees. Miss Littlewood was not the first.
16 Miss Littlewood was not the last. Basically you work with
17 an employee, and if something happened that either myself
18 or another supervisor was unhappy with, we made a decision
19 as to how serious it was and then followed through with
20 discipline. And an employee in the union had a certain,
21 those unionized employees had a grievance procedure that
22 they could follow while the nonunion employees had a,
23 could go to the Human Resources Board and eventually the

**69**

1  as the assessors' clerk before, that you were in charge of
2  when you supervised her before this decision was made?
3     A. That's correct.
4     Q. Who did those duties after the Board of
5  Assessors --
6     A. I am assuming she did but I do not have any direct
7  knowledge of that.
8     Q. You stated that there was this period of time when
9  she was supervised by the Board of Assessors before
10 certain decisions were made?
11    A. Mm-hmm.
12    Q. Were, when were those decisions made?
13    A. I think it was probably January. This took place
14 in October, November. And maybe it was in January or
15 February when the Board of Assessors and the Board of
16 Selectmen and the Human Resources Board, myself and
17 Miss Littlewood all met at an assessors' meeting, and at
18 that point it was decided it was joint supervision. The
19 Board of Assessors and town administrator, and the Board
20 of Assessors voted as such.
21    Q. So at that point you're saying January, February?
22    A. Several months later, mm-hmm.
23    Q. of 2001?

**70**

1     A. January or February, I'm not, I can't say what the
2  date is exactly.
3     Q. And so at that point you took over, you had-- how
4  long did that last?
5     MR. TEHAN: Object to the form.
6  Respectfully, you didn't complete the question. If it
7  were read back. If you don't mind, were you asking after
8  that determination whether he resumed some supervision
9  over her?
10    MS. CARRITHERS: Yes.
11    MR. TEHAN: Okay, you didn't quite close it.
12 Would you answer that?
13    A. Until she resigned, you know, eight, nine months
14 later.
15    Q. So you did resume supervision of her?
16    A. (Nods head.)
17    MR. TEHAN: Would that be a yes?
18    A. That's a yes.
19    Q. For how long?
20    A. About seven or eight months. She resigned in
21 September of '01.
22    Q. And during that time, did she fail to complete
23 tasks for you?

**71**

1     A. No.
2     MS. CARRITHERS: I think I'm pretty much
3  done.
4     MR. TEHAN: Okay, can we take a break for a
5  couple of minutes.
6     (Discussion held off the record.)
7     <u>CROSS-EXAMINATION</u>
8     Q. (By Mr. Tehan) Good afternoon, Mr. Racicot.
9     A. Good afternoon.
10    Q. Who appointed you to your position in the Town of
11 Orange?
12    A. The Board of Selectmen.
13    Q. And what was your date of appointment?
14    A. It was July 1999. I'm not, I want to say the 19
15 but I'm not going to guarantee it.
16    Q. Your position again was what, sir?
17    A. Town administrator.
18    Q. And you mentioned earlier in response to my
19 sister's question that you were responsible for
20 supervision of Board of Selectmen appointments?
21    A. Correct.
22    Q. And can you lay out at least in part who those
23 appointments were?

**72**

1     A. Boy, there were quite a few. The Highway
2  Department, anyone within the Highway Department, economic
3  development, the town accountant, building inspector,
4  administrative assistants within the building. It's
5  almost easier to say who I wasn't responsible for. The
6  Fire Department, the Police Department, I didn't appoint
7  them but I had the authority, I was supposed to supervise
8  them, that had been delegated by the Board of Selectmen.
9  The Water Department I did not, the town clerk was
10 elected, the treasurer elected, the treasurer and
11 collector were elected.
12    Q. Now, with respect to the position of the clerk to
13 the Board of Assessors, who appointed Miss Littlewood to
14 that position?
15    A. She was there when I started working but I was
16 told that she was appointed by the Board of Selectmen.
17    Q. And who told you that?
18    A. Robert Andrews.
19    Q. And at the time he told you that, what was his
20 position in the Town?
21    A. He was the interim town administrator.
22    Q. And did you discuss with him what your role was in
23 a supervisory sense generally at or before the time you

73

1  began work of all the BOS appointees?
2      A. Well, he basically explained to me who I would be
3  responsible for overseeing.
4      Q. And did he tell you that you would be responsible
5  for supervising Miss Littlewood?
6      A. He did; he mentioned Miss Littlewood because she
7  was a new hire.
8      Q. Now, at the time that you took office or took your
9  position, do you know whether there was a written job
10 description for the position of assessors' clerk?
11     A. I'm not, I can't say for sure whether there was or
12 wasn't.
13     Q. Among the job descriptions that MMA, MMA prepared
14 for you or prepared for the Town, was one of those
15 positions the assessors' clerk position?
16     A. Yes.
17     Q. And how did the job descriptions return from MMA
18 to the Town, to whom were they transmitted?
19     A. They came back to the Human Resources Board.
20     Q. And were you provided with copies?
21     A. Oh, sure.
22     Q. And did you review them?
23     A. Yes.

74

1      Q. And when that job description was prepared by MMA,
2  did you look over the description for assessors' clerk?
3      A. I read over it, yes, that one and others.
4      Q. And do you recall today under that job description
5  who was established as the supervisor or responsible for
6  supervision of that position?
7      A. It was joint supervision.
8      Q. Between whom?
9      A. Between the town administrator and the Board of
10 Assessors.
11     Q. Now, did Miss Littlewood sign that job description
12 that you've just described?
13     A. Yes.
14     Q. Did she ever prepare on her own and write for
15 herself her job description to your knowledge?
16     A. Not to my knowledge.
17     Q. Now, at any point during the time when you and
18 Miss Littlewood both worked for the Town, was her
19 performance as assessors' clerk formally evaluated?
20     A. Yes.
21     Q. By whom?
22     A. Myself.
23     Q. And did the assessors evaluate her performance?

75

1      A. No.
2      Q. And in a general sense, how would you characterize
3  the evaluation that you gave her?
4      A. It was favorable.
5      Q. And do you know if that evaluation was placed in
6  her personnel file?
7      A. I believe it was.
8      Q. Did you ever remove it for any purpose?
9      A. No.
10     Q. In a general sense, prior to the interactions you
11 had with Miss Littlewood with respect to the recap form in
12 2000, how would you characterize your interactions with
13 her?
14     A. They were generally favorable. She, on most
15 occasions she was doing a pretty good job.
16     Q. Did you feel you got along well with her?
17     A. I felt that way, yes.
18     Q. Now, you mentioned that there were some issues or
19 complaints that arose concerning her performance vis-a-vis
20 relations with the public, is that correct?
21     A. That's correct.
22     Q. And how did those come to your attention?
23     A. I would, either some came by telephone, some were

76

1  written complaints.
2      Q. Did you solicit those complaints?
3      A. No.
4      Q. Did you address those complaints?
5      A. I spoke to her and I also, you know, would speak
6  with the people.
7      Q. And if you do recall, what was Miss Littlewood's
8  response to those complaints when you conveyed them to
9  her?
10     A. She promised that she'd work hard to resolve them
11 and, you know, they would not take place in the future.
12     Q. Was there ever a point when you indicated that you
13 would assume, in lieu of her, the interactions with the
14 public?
15     A. Oh.
16         MS. CARRITHERS: I'm sorry, I just didn't
17 hear what you said.
18         MR. TEHAN: That's fine.
19     Q. Was there ever a time where you agreed to assume,
20 instead of her, these interactions with the public?
21     A. I did tell her that but as a supervisor, and I do
22 this with all employees, if they're having a difficult
23 time with a member of the public and it's becoming very

81

1   the part of Town Meeting?
2       A. No.
3       Q. Did any one of the selectmen suggest that it had
4   that requirement?
5       A. No.
6       Q. Now, at some point did you learn that anyone had
7   any misgivings about this proposal?
8       A. Yes.
9       Q. Who was the first person who expressed those to
10  you?
11      A. That was the telephone call that I got at home
12  from the town accountant.
13      Q. And, again, what did she say to you in that call?
14      A. That it was becoming a political football and she
15  didn't want to see me hurt by it.
16      Q. And you had defined for our purposes today a
17  political football in this regard as being a dispute
18  between elected town Boards, is that correct?
19      A. That's what I would call it.
20      Q. Was this the first knowledge you had of any
21  dispute concerning this proposal among town Boards?
22      A. Yes, yes, it was.
23      Q. Now, at some point did Miss Littlewood approach

82

1   you to discuss some misgivings with this proposal?
2       A. Not until later.
3       Q. I understand but did she at some point?
4       A. Yes.
5       Q. And at some point did Mr. Reppas approach you in
6   that regard?
7       A. He said he wanted to review it.
8       Q. Who came to you first?
9       A. Mr. Reppas.
10      Q. And he was one member of the Board of Selectmen,
11  is that correct?
12      A. That's correct.
13      Q. And what did he say to you exactly as best you can
14  recall?
15      A. He said that he had some, he had misgivings and he
16  wanted to, he wanted to think about it to review it, and I
17  explained, Arthur, it's already been voted twice, I said,
18  so we need, so, you know, at this point it needs to be
19  followed through.
20      Q. Let me backtrack for a minute. We had discussed
21  already one meeting of the selectmen where this proposal
22  to establish the reserve account was approved, correct?
23      A. Correct.

83

1       Q. Do you know why the matter was voted on again?
2       A. Because the assessors raised it at the tax
3   classification hearing.
4       Q. So that we have a time line, is it accurate to say
5   that you presented this proposal to the Board of Selectmen
6   and secured its approval?
7       A. Yes.
8       Q. And that thereafter there was a so-called tax
9   classification hearing?
10      A. Two weeks later.
11      Q. And what is the purpose for a tax classification
12  hearing?
13      A. It's for the Board of Selectmen to set the factor
14  of how they're going to assess taxes. A factor of one
15  means that all classes are the same. Different factors
16  would mean that business and commercial would pay more and
17  residential would pay less.
18      Q. In your experience as a municipal official, is
19  that a proceeding that takes place each year in town?
20      A. It's required by law every year.
21      Q. And with respect to the particular classification
22  hearing in 2000, did the Board of Assessors appear?
23      A. Yes.

84

1       Q. And did they all appear?
2       A. They were all there.
3       Q. And who were those people?
4       A. Norman Bartlett, Stephen Adams and Shari
5   Littlewood.
6       Q. Did one of those people speak on behalf of the
7   assessors?
8       A. I believe it was Stephen Adams.
9       Q. Do you have any memory of Miss Littlewood saying
10  anything herself at that meeting?
11      A. I don't remember that she said anything.
12      Q. And in essence what did, or as accurately as you
13  can give it, what did Mr. Adams say?
14      A. Well, they talked about the reason that they were
15  there which was the classification, and then he did raise
16  the issue that they felt that the ambulance, using the
17  ambulance reserve would require that, it would raise the
18  tax rate by 71 cents without a Town Meeting vote.
19      Q. And is it your testimony today to the best of your
20  knowledge and computations that figure that they
21  presented, 71 cents, was erroneous?
22      A. It was erroneous. It was inflated by half, by a
23  hundred percent.

85

1    Q. And is that because they forgot to consider that
2  by taking the funding out of the general fund to establish
3  the reserve account there was no longer that expense in
4  the general account?
5    A. That's correct.
6    Q. Okay. And was there a discussion at that meeting
7  as to whether this matter needed to be addressed by Town
8  Meeting?
9    A. The assessors felt so. The selectmen at that
10 meeting said they made a decision and they were going to
11 stay with that decision.
12   Q. Do you recall anything else about that meeting?
13   A. No, not in regards to this matter.
14   Q. Were you upset by the comments of the assessors?
15   A. No.
16   Q. Were you offended by them?
17   A. No.
18   Q. Did you take them personally?
19   A. No.
20   Q. Did you make any comments at the meeting?
21   A. I don't believe I did.
22   Q. After that meeting did the selectmen vote again
23 with respect to the establishment of the reserve account?

86

1    A. There was no formal vote.
2    Q. Did you take any efforts to determine whether the
3  comments of the assessors had changed the minds of the
4  Board of Selectmen?
5    A. Not until the following week when Mr. Reppas came
6  in.
7    Q. So that we understand each other, there was again
8  a vote taken to approve the proposal, correct?
9    A. Mm-hmm.
10   Q. Is that a yes?
11   A. Yes.
12   Q. A classification hearing at which some misgivings
13 were expressed by the assessors, correct?
14   A. Yes.
15   Q. And is the next thing that happened that you
16 recall concerning this meeting in terms of anyone
17 expressing problems with it Mr. Reppas's coming to you?
18   A. Yes.
19   Q. Okay. Now, after the classification meeting, were
20 there any other hearings or meetings that needed to be
21 undertaken to your knowledge before the recap sheet could
22 be prepared?
23   A. No.

87

1    Q. And what was the next task then that lay in the
2  process of establishing the recap sheet?
3    A. Just to prepare the forms, circulate them amongst
4  the relevant parties, sign them and send it to the State
5  for certification.
6    Q. And whose job was that?
7    A. The assessors' clerk.
8    Q. Miss Littlewood?
9    A. Miss Littlewood.
10   Q. Had she done that the year prior after the
11 classification hearing took place --
12   A. Yes.
13   Q. -- the classification meeting?
14   A. Yes, she had.
15   Q. Had she done so without any undue delay to your
16 perception?
17   A. None. None that I was aware of.
18   Q. Did you give Miss Littlewood any express direction
19 to commence work on the forms or the form after the
20 classification meeting?
21   A. Yes, I did.
22   Q. And when did you do so?
23   A. The following Monday.

88

1    Q. On what day was that meeting held, do you know?
2    A. Maybe the 10th, 9th, 10th of October.
3    Q. What day of the week, do you remember?
4    A. A Monday.
5    Q. Are you saying you gave her some direction on the
6  same day as the classification meeting?
7    A. No, I waited a couple of days. I originally
8  assumed that she was going to do it.
9    Q. What caused you to speak with her a couple of days
10 later?
11   A. I was told by someone in her office that I needed
12 to check on it.
13   Q. Who told you that?
14   A. The treasurer, Virginia Jones.
15   Q. What did she say to you?
16   A. She came and told me, she said, "You'd better
17 check on that. Did you notice that Shari paused when you
18 asked her about it?"
19   Q. Okay. After the classification hearing or
20 meeting, had you asked Miss Littlewood the status of the
21 forms?
22   A. The following Monday.
23   Q. And what did she tell you?

89

1    A. She told me they were complete.

2    Q. After some pause?

3    A. After a pause.

4    Q. And it was at that point that Miss Jones came to

5    you?

6    A. Miss Jones, after I left the assessors' office,

7    it's an office shared by the collector, the treasurer and

8    the assessor, after I left that office and went back to my

9    office, a few minutes later the treasurer came to my

10   office and made, and told me that I'd better check into it

11   further.

12   Q. What's the next step that you took toward getting

13   the recap sheet prepared?

14   A. I went down and explained to Shari that it had to

15   be completed.

16   Q. How long after Miss Jones came to you did you do

17   that?

18   A. It was that day. I actually, actually, I called

19   the Department of Revenue because Miss Littlewood had told

20   me that they were done and submitted, and then when I

21   called the State I learned that they hadn't been

22   submitted, so I went back to the office.

23   Q. At what point in our time line here did

90

1    Miss Littlewood tell you that the forms had been prepared

2    and submitted?

3    A. She told me that on a Monday.

4    Q. How long after the classification meeting?

5    A. That was, the classification meeting was either

6    Tuesday or Wednesday.

7    Q. Of the week prior?

8    A. Of the week prior.

9    Q. And you confirmed that that was not the case?

10   A. I confirmed that wasn't the case.

11   Q. Did you confront her with what you found?

12   A. Yes.

13   Q. What did you say to her and she say to you?

14   A. She claimed that she had misspoke and she was

15   waiting for one more. They were going to sign them that

16   night.

17   Q. And what was your response to that?

18   A. Okay. I believed her.

19   Q. Did you see the forms the next morning?

20   A. No.

21   Q. What step did you next take?

22   A. I told her that we had to have the forms and I had

23   to see them, and she told me that she was working on them

91

1    and they would be done.

2    Q. Did she give you an end point at that point?

3    A. No.

4    Q. Now, did Mr. Reppas come to you before or after

5    your call to the Department of Revenue?

6    A. Afterwards.

7    Q. And after he expressed his desire to consider this

8    at more length or to reconsider it, did you do anything to

9    take the pulse or get the ongoing feeling of the selectmen

10   on this issue?

11   A. I did.

12   Q. What did you do?

13   A. It's a three-member board, so I contacted the

14   other two members of the board and I asked them if they

15   had the same feelings, were they going to change their

16   vote, and both of them indicated to me that they weren't

17   going to change their vote.

18   Q. After that, after that call, what was your

19   understanding as to the status of the Board of Selectmen

20   on the issue of the ambulance reserve fund?

21   A. That the majority of the Board of Selectmen were

22   going to follow through on this vote and the accounting

23   change was done.

92

1    Q. Did Miss Littlewood ever tell you that Mr. Reppas

2    had told her, "Don't listen to Mike on that point"?

3    A. She didn't tell me he said don't listen to me.

4    Q. Did she say anything that he had told her to you?

5    A. She said that he had come down and talked to her

6    and he had said to her that she didn't have to, you know,

7    he wanted to reconsider it and that, you know, not to

8    worry about whether she got the forms done.

9    Q. Do you have any doubt that he told her that?

10   A. Knowing Arthur Reppas, he may have.

11   Q. To your understanding at that point during the

12   time this was unfolding, what power did he have to dictate

13   the status of this reserve fund on his own?

14   A. He had no power to do so.

15   Q. Now, can you tell us approximately how many times

16   you made requests of Miss Littlewood for the recap forms?

17   A. Four days in a row.

18   Q. And what were her responses sequentially on those

19   four days?

20   A. The first time she told me she had done it

21   already. That's when Virginia Jones told me to go back

22   and ask again and I called the State and found out it

23   hadn't happened.

**93**

1  The second time was, oh, no, that was the
2  same day, she said, "Oh, well, I misspoke. We need some
3  signatures." And the second time, they're all done, I'll
4  be getting them to have them signed. And then the third
5  day it was the same thing, I'm going to get it taken care
6  of. The fourth day, you know, I asked for them and still
7  she hadn't produced them, and that's when I gave her the
8  ultimatum they have to be on my desk this afternoon by
9  four o'clock. Before you go home they must be done.
10  Q. And how did you give her that directive, was it
11  face-to-face?
12  A. Face-to-face in the office.
13  Q. Did she tell you they would not be done at that
14  point?
15  A. No, she started yelling at me in the office about
16  that I was being nasty.
17  Q. Were you being nasty?
18  A. No, I was her supervisor and I asked for work and
19  I had been asking for several days in a row and it just
20  didn't seem to be getting done.
21  Q. Did she agree to provide them to you by four
22  o'clock that evening?
23  A. Yes, she said they'd be on my desk.

**94**

1  Q. Why were you pressing this point each day?
2  A. Because, well, partly because other people in the,
3  on the financial team and in the building were telling me
4  that she was, that she wasn't telling me the truth. The
5  other thing is yeah, it was an issue but it was an issue
6  that the Board of Selectmen had voted on twice and had
7  decided, had told me, a majority had told me that they
8  were going to keep it. Now, you have to get the tax recap
9  sheet in because it takes the State a little while to
10  certify it. They go through the numbers, make sure it's
11  correct, and then they give you the okay and then there's
12  the process of setting up the commitment for taxes.
13  It's a cash flow. It's just like at home
14  with your checkbook and you're expecting certain money to
15  come in your paycheck to pay those bills and if you don't
16  have the -- that's our biggest revenue is taxes, so the
17  longer we delay it the more chance there is that we won't
18  have enough money in the bank to cover the bills that are
19  still coming in every week.
20  Q. Without the submission of a recap sheet to the
21  Department of Revenue, can the State certify a tax rate
22  for a town to your knowledge?
23  A. They won't.

**95**

1  Q. And without that certification, to your
2  understanding what ability does the Town have to send out
3  its tax bills?
4  A. It doesn't have the ability to do so.
5  Q. Who else apart from Miss Jones, if you remember,
6  told you that Miss Littlewood was not being accurate in
7  her representations to you about the status of these
8  forms?
9  A. Doris Bittenbender, the town accountant.
10  Q. What did she tell you?
11  A. She said that she was aware that there were forms
12  that were missing that hadn't been, she hadn't gotten the
13  forms that she knew she had to certify.
14  Q. As part of the recap sheet?
15  A. As part of, it's a package, there's, you know, a
16  dozen forms.
17  Q. Now, do you remember on what date you had required
18  or ordered Miss Littlewood to provide you with the forms
19  at four o'clock?
20  A. That was Thursday, maybe the 11th or the 12th.
21  I'm not sure exactly what date the suspension or what date
22  was the final one. I know it was a Friday morning.
23  Q. Now, as you testified earlier, were the forms

**96**

1  provided to you at that point?
2  A. On the Thursday at four o'clock?
3  Q. Yes.
4  A. No.
5  Q. Did you go looking for them?
6  A. I did.
7  Q. And had Miss Littlewood left?
8  A. She had left, she had already left the building.
9  Q. Did you approach her the next morning?
10  A. I did.
11  Q. Was it at that point that she pointed to some
12  papers in her inbox?
13  A. Yes.
14  Q. And were those papers at least in part the recap
15  sheet package?
16  A. The package, yeah, incomplete but most of it was
17  there.
18  Q. Was that package complete except for the signature
19  of the assessors?
20  A. No, there were several other places. There was
21  one form that hadn't, the selectmen hadn't gotten to sign,
22  there were a couple that the town clerk hadn't gotten to
23  sign and there were some that the town accountant hadn't

97

1    received to sign.
2        Q. Now, was the town clerk available at that period
3    in time?
4        A. The town clerk, the full town clerk was not there
5    but we had, the assistant town clerk was there at that
6    time.
7        Q. And to your knowledge in the absence of the town
8    clerk, had she assumed the clerk's authority?
9        A. An assistant town clerk, a sworn-in assistant town
10   clerk has full authority to do anything that the town
11   clerk does.
12       Q. Which person by name are we referring to was the
13   assistant town clerk?
14       A. Her name was Shirley Paige.  She was the retired
15   town clerk after 30 years.
16       Q. Now, you said she was the retired town clerk.  At
17   the time of the processing of this recap form, was she the
18   assistant town clerk?
19       A. She was the sworn-in assistant town clerk.
20       Q. Did you view her signature on these forms as legal
21   and appropriate?
22       A. It would have been.
23       Q. And did you secure from her certain signatures

98

1    after you got the package from Miss Littlewood?
2        A. Well, the point is I never did get the package.
3        Q. Okay, when you received the package from
4    Miss Littlewood, was there any document executed by the
5    town clerk?
6        A. I'm not sure.  There may have been, there's a
7    couple that the town clerk does and one may have been, but
8    I know there was at least one or two that weren't.
9        Q. Let me ask you this:  Did you present any
10   documents with respect to the fall '00 recap sheet to
11   Miss Paige?
12       A. No.
13       Q. Do you know who did if anyone?
14       A. If anyone did, it was probably -- do you mean on
15   that day or do you mean to move forward?
16       Q. With respect to the recap sheet to be submitted to
17   the State in the fall of 2000, was there a requirement
18   that the, that certain forms that comprise part of it be
19   executed by the town clerk?
20       A. Yes.
21       Q. Okay.  With respect to that specific package, did
22   you present any of those forms requiring town clerk
23   execution to Miss Paige?

99

1        A. No, I did not.
2        Q. When you saw, when you -- I trust you removed the
3    package from Miss Littlewood's inbox, correct?
4        A. I did.
5        Q. Did you review it in her presence?
6        A. No, actually, I brought it over to the town
7    accountant to review it.
8        Q. Okay.  Did you do so?
9        A. I did.
10       Q. Did Miss Bittenbender review it?
11       A. Yes.
12       Q. And did she make any comments on the package that
13   Miss Littlewood had given you?
14       A. She explained what was deficient.
15       Q. And was it, as best you can recall, what you just
16   told us?
17       A. Yes.
18       Q. What did you next do if anything?
19       A. I went back to Miss Littlewood and told her that I
20   needed to speak with her in private.
21       Q. Okay.  Now, was this on the same day she was
22   suspended?
23       A. Yes.

100

1        Q. And was this before the financial team meeting?
2        A. Yes.
3        Q. By the way, was there any agreement between anyone
4    as to who would ultimately circulate this package for
5    signatures to the assessors?
6        A. I don't think there was ever an agreement.  I
7    explained to Miss Littlewood that I wanted the forms and
8    then that Mrs. Bittenbender and I would go to the members,
9    the other members and get the signatures that were
10   necessary.
11       Q. Had Mrs. Bittenbender agreed to do that with you?
12       A. Oh, yes, she was concerned that it be done.
13       Q. Now, what happened in this next discussion when
14   you indicated you wanted to have a private meeting with
15   Miss Littlewood?  Specifically did you have a private
16   meeting with her?
17       A. I did.  I took her in the back and I explained,
18   and I told her that I was not happy that she just put me
19   off for a week, that, you know, that she had told me this
20   work was complete and it wasn't and, you know, I still had
21   the forms in my hand incomplete in the folder and that,
22   you know, I was really upset about it.
23       Q. What did she say?

**105**

1  Q. What was the purpose of those meetings?

2  A. We went over all types of, anything that had to do

3  with the finances for the community, the revenue coming

4  in, the taxes, the grants, any sort of financial

5  decisions, healthcare costs, what are we going to do in

6  the coming year, things like that. We met once a month.

7  Everybody was involved. People could bring up stuff. You

8  know, I do an agenda and then we would have a free flowing

9  discussion if people had concerns.

10  Q. And this was a regularly scheduled meeting?

11  A. Yes.

12  Q. Forgive me, with what frequency?

13  A. Monthly.

14  Q. And with reference to your Exhibit 1 as a, as

15  reflecting a date of October 13, 2000, did you attend a

16  financial team meeting with Miss Littlewood on that date?

17  A. She was present. That must have been it, yes,

18  Friday the 13th.

19  Q. And do you recall that meeting and what was said

20  at it at least in some respects, yes or no?

21  A. Yes.

22  Q. Okay. Was there any discussion that related to

23  the issue of setting taxes?

**106**

1  A. There was one, it was brought up, yes.

2  Q. Who brought it up?

3  A. The treasurer brought it up.

4  Q. And that's Miss Jones?

5  A. Virginia Jones.

6  Q. What did she say?

7  A. She wanted to know what the status was as far as

8  the recap in setting the tax rate.

9  Q. Was she the first one to mention the recap sheet

10  at that meeting?

11  A. I can't say that for sure.

12  Q. Okay. But you do recall her raising it?

13  A. I do recall her talking about it.

14  Q. And to whom did she address that question?

15  A. Me.

16  Q. And what did you say?

17  A. I said "We've got problems there. Our tax recap

18  hasn't been submitted, and Shari, as a representative of

19  the assessors' office, can maybe explain what's going on

20  with that."

21  Q. To the best of your memory, is that exactly what

22  you said?

23  A. That's pretty close to it.

**107**

1  Q. Did you accuse Miss Littlewood at that meeting of

2  being the reason that the Town had to borrow money?

3  A. No.

4  Q. As of that date did the Town have to borrow money?

5  A. No, we had that discussion though that if we

6  didn't have, the tax rate wasn't set and we didn't have

7  the tax bills out in time, we would have to borrow money.

8  Q. What happened after you referred that question to

9  Miss Littlewood?

10  A. She became very emotional.

11  Q. What does that mean?

12  A. Well, it means her face got red, she started

13  yelling at me saying that I had no right to bring that up

14  at this time and Mrs. Jones disagreed with her.

15  Q. What did she say?

16  A. She said "This is the finance team. We want to

17  discuss anything that has to do with the finances of the

18  Town," and I agreed with that.

19  Q. Okay.

20  A. She said "I will not talk about this."

21  Q. Did you yell at her at the meeting?

22  A. When she was yelling at me, she was sitting over

23  at the table and she was yelling at me and everybody else

**108**

1  is almost stunned, I said "That's the end of that. I'll

2  see you out in the lobby."

3  Q. Was the meeting still going on when you made that

4  statement?

5  A. Yes.

6  Q. Did the meeting end at that point?

7  A. No, we went on to some other discussion briefly.

8  Q. Did you complete that financial team meeting?

9  A. Yes.

10  Q. Was there any other interaction between you and

11  Miss Littlewood at that meeting?

12  A. At that point, I don't believe so.

13  Q. And after the meeting did you meet with her again

14  in the area near the elevator?

15  A. Yes.

16  Q. Was there anyone to your knowledge at that point

17  near that area?

18  A. I'm not aware of anyone being there.

19  Q. Okay. Why did you choose that area?

20  A. Because it's the one area where there's some

21  privacy away from, you know, everybody else.

22  MR. TEHAN: Just give me a minute please.

23  Q. Did you perceive at that time Miss Littlewood as

**109**

1  being insubordinate or disrespectful to you at the
2  financial team meeting?
3      A. Absolutely.
4      Q. On what basis?
5      A. You don't sit and yell and scream at your
6  supervisor and tell them what they're going to do and what
7  they can ask you, especially in front of a whole room of
8  all the other professionals in the building.
9      Q. When you met with Miss Littlewood after the
10  financial team meeting, did you have with you the
11  documents she had provided you comprising part of the
12  recap sheet?
13      A. I don't think so.  I had documents that I had
14  taken to the finance team meeting but I don't believe I, I
15  don't believe I still had the recap documents with me.
16      Q. Did you present or show her at that meeting any
17  forms that had those post-it notes saying sign here?
18      A. I never showed her anything.  I may have had
19  something in my hand, but I never showed her forms or
20  anything except the form for the suspension.
21      Q. What did you say to her and what did she say to
22  you at this meeting?
23      A. She was yelling.  She said, "I'm not going to, I'm

**110**

1  not going to talk to you any more."  I, you know, "You
2  just want me to sign those documents."  I said, "That's
3  not what it is."  I said, You need to ratchet down, well,
4  maybe I didn't say ratchet.  "You need to calm down."  And
5  she wouldn't.  She was crying, she was emotional, she was
6  feeling like, she said "Call the rest of the Board of
7  Assessors."  I said "It's got nothing to do with them."  I
8  said, "You're here, you're the clerk, I'm here as the town
9  administrator.  I told you to complete a job.  You lied to
10  me.  You told me you had completed it.  I find out after
11  five days that you didn't complete it, and I said that's
12  what it is and you respond by yelling."
13      Q. Is that what you said to her?
14      A. Yes.
15      Q. And at that point did you serve her with the
16  Notice of Suspension we've marked as Exhibit 1?
17      A. I did.
18      Q. Okay.  I'd like to take a moment.
19          MR. TEHAN:  Off the record.
20          (Discussion held off the record.)
21      Q. To review Exhibit 1 with you, the first line reads
22  "You are being suspended for three days beginning October
23  17, 2000, for your failure to complete essential paperwork

**111**

1  after a direct order from your supervisor to do so."  Did
2  I read that correctly?
3      A. That's what I wrote.
4      Q. And of course the essential paperwork was what?
5      A. The tax recap package.
6      Q. And this indicates a direct order, is that
7  correct?
8      A. (Nods head.)
9      Q. Is that correct?
10      A. Very clear, very clear.
11      Q. How many times prior to October 13, 2000, did you
12  direct Miss Littlewood to complete the recap sheet
13  paperwork?
14      A. Probably just the once, the Thursday before which
15  would have been the 12th.
16      Q. Would you consider your other discussions with her
17  status inquiries?
18      A. Yes, I was trying to get from her when she was
19  going to do it and I just didn't get an answer or not a
20  truthful answer.
21      Q. You indicate in the next paragraph "You were given
22  sufficient time to complete the tasks but deliberately
23  delayed completion despite instructions."  Do you see

**112**

1  that?
2      A. Mm-hmm.
3      Q. Yes?
4      A. Yes.
5      Q. On what basis did you conclude that there had been
6  a deliberate delay on Miss Littlewood's part in completing
7  these forms?
8      A. I can't imagine why you would tell your supervisor
9  you had completed something when you hadn't over the
10  course of that many days unless it was deliberate.
11      Q. And you indicate in your memo "Your actions had a
12  direct, negative effect on the timeliness of the Town of
13  Orange," do you see that?
14      A. That's correct.
15      Q. What did you mean by that?
16      A. I meant the longer those forms weren't complete
17  the longer it was going to take us to get our tax rate
18  certified.
19      Q. What response did Miss Littlewood make when you
20  handed her the Suspension Notice if any?
21      A. She told me she no longer respected me at all.
22      Q. Did you say anything further?
23      A. (Nods head.)

**113**

1   Q. Is that a no?
2   A. That's a no.
3   Q. Okay.
4   A. I don't think I made any comment after that point.
5   Q. As I understand it, this suspension was appealed
6   to the Human Resources Board, correct?
7   A. That's correct.
8   Q. Did you direct Miss Littlewood to take her appeal
9   of your suspension to the Human Resources Board?
10   A. Yes, I did.
11   Q. And was that in response to a question from her?
12   A. Yes.
13   Q. And did she ask you how do I appeal this?
14   A. Yes.
15   Q. Why did you refer her to the Human Resources
16   Board?
17   A. Because that was my understanding that was the
18   next step in the grievance policy such as it was.
19   Q. What was the purpose and function of the Human
20   Resources Board in 2000 in Orange as you understood it?
21   A. They dealt with all the different matters related
22   to the personnel bylaw to, primarily they worked on the
23   personnel bylaw. They were involved in doing the job

**114**

1   descriptions, job classifications. It was a group of
2   volunteers who met monthly, sometimes more often as the
3   need arose. They did perform a function in that they
4   heard grievances if there were any. Made decisions on
5   raises for example.
6   Q. You mentioned there were two meetings of the Human
7   Resources Board that addressed Miss Littlewood's appeal,
8   correct?
9   A. That's correct.
10   Q. And you mentioned that she stated her case and you
11   stated yours so to speak at the first meeting, is that
12   correct?
13   A. That's correct.
14   Q. Do you recall what she said at that meeting?
15   A. She feels, and maybe she really believes it at
16   this point, she feels that I wanted her to sign those
17   papers. I said it as many times as I could to her that
18   that was not the issue. That's not what it is.
19   Q. I appreciate your comment but if you would can you
20   tell me exactly what she said at that first meeting of the
21   Human Resources Board front to back?
22   A. The first meeting she was complaining that I had
23   requested her -- that I had suspended her only because she

**115**

1   wouldn't sign the forms.
2   Q. Did she raise at that meeting the issue of whether
3   or not you had any supervisory authority over her?
4   A. That was the big issue at the second meeting but I
5   can't say for sure, although now that I -- well, I'm
6   thinking about it and it must have been raised at that
7   meeting because we had a couple of legal opinions at the
8   following meeting as to who was supervising her.
9   Q. Who provided those opinions?
10   A. We had a labor counsel whose name was Edward
11   Doocey. He provided an opinion that the town
12   administrator did. And then we had an opinion from an
13   attorney from the Department of Revenue who said no, the
14   assessors, because the budget, it was in their budget, the
15   assessors did. So it must have been raised at the first
16   meeting.
17   Q. Were these hearings or did you consider them
18   hearings?
19   (Pause.)
20   Q. Let me ask you a different question,
21   notwithstanding your consideration. Was the public
22   invited to both of these convocations?
23   A. No, they were, it was originally she received

**116**

1   notification that it would be held in executive session,
2   but she chose, under the law if you choose to you can have
3   it as an open meeting.
4   Q. Okay.
5   A. And that was her decision to hold it in open
6   session.
7   Q. Now, did you give your basis for the suspension
8   and your version of events at the first meeting of the
9   Human Resources Board?
10   A. Yes.
11   Q. Now, was that an executive session?
12   A. No, because she had requested that it be held in
13   open session.
14   Q. So both sessions were open?
15   A. Yes.
16   Q. And what did you say?
17   A. I went through a time line. I explained how we
18   got to where we got, what the issue, you know, her issue
19   and, you know, mine, that basically I had asked for this
20   three or four days in a row but kept getting stories that
21   it was done and then it needed this and then it needed
22   something else, and finally I ordered her to produce it,
23   she didn't, and then when I confronted her about that, she

117

1  started screaming at me.  At that point it was like I'm
2  suspending.
3      Q.  That's what you told the Human Resources Board?
4      A.  Yes.
5      Q.  Did you call her a liar at that meeting?
6      A.  I said she lied to me.
7      Q.  And did you do that in the context of defending
8  your decision to suspend her?
9      A.  Well, that's what it was based on, yes.
10     Q.  You didn't make this as a gratuitous comment
11  anywhere else, did you?
12     A.  No.
13     Q.  And on what basis did you say she had lied to you?
14     A.  Telling me that the forms were complete when they
15  weren't.
16     Q.  Is it -- strike that.
17         Did either of you represent his or her
18  positions at the second HRB meeting or hearing?
19     A.  No, at that time the whole focus of the second
20  meeting was about the fact that I didn't have the
21  authority to act.
22     Q.  To your knowledge, did the HRB ever determine that
23  your decision to suspend Miss Littlewood was without a

118

1  substantive basis?
2      A.  Never.
3      Q.  What is again your understanding of why that, why
4  the decision was rescinded or the suspension was
5  rescinded?
6      A.  Because the question was raised that I didn't have
7  a right to do it, that I was, you know, I didn't have the
8  authority because I wasn't her supervisor.
9      Q.  Is it accurate to say that for a period of time,
10  as I believe you testified earlier, Miss Littlewood was
11  then under the sole supervision of the assessors?
12     A.  That's correct.
13     Q.  Did you stay away from her at that point as you
14  indicated earlier?
15     A.  Absolutely.
16     Q.  Did you have any interaction with her of an
17  untoward or unpleasant nature during that period?
18     A.  No.
19     Q.  You mentioned that at some later point there was a
20  determination made that there would be joint supervision
21  by the assessors and the selectmen over the position of
22  assessors' clerk, is that correct?
23     A.  Yes.

119

1      Q.  And I'm going to show you a document that we've
2  marked as Littlewood Exhibit 16 and ask you if you can
3  identify that document?
4          (Document Perusal.)
5      A.  That's correct, it looks like it's signed.
6      Q.  Okay, I appreciate that.  What is that document?
7      A.  This is the, this is the finding or the agreement
8  between the three Board of Directors on how the
9  supervision of the assessors' clerk would take place.
10     Q.  The three Board of Directors being the Human
11  Resources Board, the Board of Selectmen and the Board of
12  Assessors?
13     A.  That's correct.
14         MR. TEHAN:  Can we mark that as well Racicot
15  2.
16         (Exhibit No. 2 marked.)
17     Q.  Would it be fair to your understanding to
18  characterize the agreement reflected in Exhibit 2 as
19  denoting a joint supervision of the position of assessors'
20  clerk between the selectmen and the assessors?
21     A.  Yes.
22     Q.  Prior to the Human Resources Board proceedings
23  that addressed Miss Littlewood's suspension, was your

120

1  understanding of the supervision of the clerk to the
2  assessors' position as being what's reflected in Exhibit
3  2?
4      A.  Yes.
5      Q.  After January 29, 2001, the date of Exhibit 2, did
6  you resume your supervision of Miss Littlewood?
7      A.  That's correct.
8      Q.  Did you have any other untoward incidents with her
9  of any type?
10     A.  No.
11     Q.  Did she complain to you about your conduct toward
12  her during that later period after January 29, 2001?
13     A.  No.
14     Q.  To your knowledge, did she complain to anyone else
15  about your treatment of her?
16     A.  To my knowledge, no.
17     Q.  Did anyone indicate to you that Miss Littlewood
18  had complained to them about your conduct after January
19  29, 2001?
20     A.  Nobody said that.
21     Q.  I'm going to show you what's been marked as
22  Exhibit 18 to Miss Littlewood's depo and ask if you've
23  ever seen it before?

**121**

1          (Document Perusal.)
2     A. August 15 letter of resignation, I saw this.
3          MR. TEHAN: Can we mark that as well as
4 Racicot 3 please.
5          (Exhibit No. 3 marked.)
6     Q. Do you recall testifying earlier that your memory
7 was that Miss Littlewood resigned in September 2001?
8     A. Yes.
9     Q. Would this refresh your recollection that her
10 resignation was sometime prior?
11    A. Well, on this letter she says, "To facilitate a
12 smooth transition, if possible I plan to stay until a
13 replacement can be found and trained but not later than
14 October 1."
15    Q. When did she actually leave?
16    A. I thought it was sometime in September.
17    Q. Were you provided by anyone with a copy of this
18 letter of resignation?
19    A. Yes.
20    Q. Who gave you that?
21    A. She may have left it in our office. I don't know
22 for sure who left it at our office.
23    Q. Did you ever discuss with Miss Littlewood the

**122**

1 reasons for her resignation?
2     A. No.
3     Q. Did anyone ever tell you why she was resigning?
4     A. No.
5     Q. After January 29, 2001, had you threatened any
6 discipline of Miss Littlewood?
7     A. No, we had no incidents.
8     Q. Did Miss Littlewood ever complain to you in 2001
9 that people were treating her crappy?
10    A. No, she never complained to me.
11    Q. Did she ever tell you that people were shunning
12 her?
13    A. She never told me that.
14    Q. Did you observe that to be the case?
15    A. I didn't observe it but I wasn't looking for it.
16    Q. Are you aware of any issue presented to the Ethics
17 Commission concerning Miss Littlewood's dual role as clerk
18 and assessor in 2001?
19    A. Yes, I know that the Finance Committee questioned
20 it.
21    Q. Did you play any role or provide any impetus in
22 presenting that issue to the Ethics Commission?
23    A. Not at all.

**123**

1     Q. Was there any person in particular on the Finance
2 Committee who you understood to be pushing or raising this
3 issue?
4     A. The only one I could think of that spoke to me
5 about it was Dorothy Ruby.
6     Q. And did she also write some article in a
7 newspaper?
8     A. Perhaps; I'm not sure.
9     Q. What did Miss Ruby say to you?
10    A. She told me that the process was wrong when
11 Miss Littlewood was initially appointed, and that she was
12 going to try and work and make sure it was done properly.
13    Q. Did you make any comment to that?
14    A. None.
15    Q. Briefly, going back to your second meeting with
16 Miss Littlewood on the day of her suspension in the
17 elevator lobby, did you have in your hand a manila folder
18 with three sign here stickies coming out the side?
19    A. I may have.
20    Q. Was it the recap materials?
21    A. No.
22    Q. You've mentioned four or five occasions on which
23 you discussed with Miss Littlewood the recap forms and

**124**

1 getting the forms prepared, correct?
2     A. That's correct.
3     Q. Is it accurate to say that you never discussed the
4 preparation of those forms with the other assessors?
5     A. That's correct.
6     Q. And were those other assessors male?
7     A. Yes.
8     Q. And did you force the issue with Miss Littlewood
9 as opposed to the others because she was a woman?
10    A. No, she was the clerk.
11    Q. And they weren't, correct?
12    A. No.
13    Q. Is it accurate to state that Miss Littlewood
14 availed herself of the appeal process with respect to her
15 suspension that you told her about?
16    A. That's true.
17    Q. And is it accurate to say that the term
18 "grievance" as it would pertain to Orange in 2000 dealt
19 with unionized employees?
20    A. The union contract specifically had steps that you
21 took, yes.
22    Q. Using the word "grievance"?
23    A. Using the word "grievance."

Case Compress

---

**129**

1    A. No.

2    Q. Did you have somebody complete the forms other

3  than Miss Littlewood?

4    A. No.

5    Q. Did you ask Miss Littlewood to complete the forms

6  when she returned from her suspension?

7    A. By the time Miss Littlewood came back from her

8  suspension, the Board of Selectmen had voted to change

9  their vote so that the forms had to be redone, and at that

10  point she completed all of them very quickly and very

11  efficiently.

12    Q. Well, what was the date that they, I mean she was

13  suspended from the 13th?

14    A. Well, she received the Suspension Notice on the

15  13th. The actual date of suspensions were the following

16  week, they were Tuesday, Wednesday and Thursday, it was

17  three days, so they probably voted on the 17th. At that

18  time Mr. Andrews changed his vote.

19    Q. And were you, is the signature of the Board of

20  Assessors, at least one member of the Board of Assessors

21  necessary to submit the forms to the State?

22    A. At least two.

23    Q. At least two?

---

**130**

1    A. Yes, a majority.

2    Q. And you were aware that that Board of Assessors

3  was not going to complete signing the forms?

4        MR. TEHAN: I'll object. You've lost me on

5  the time frame.

6    Q. You were aware after October 4 that they were

7  objecting and had misgivings and were not going to sign

8  these?

9    A. No, I wasn't aware after, well, way after October

10  4.

11    Q. Okay. Did Miss Littlewood inform you that the

12  board of, the other assessors were not going to sign these

13  forms?

14    A. She didn't tell me that until the day she told me

15  they were objecting which was probably a week later. It

16  was the day before I ordered her to give me the forms that

17  I would take my chances and see if I could convince the

18  other two members, if Doris and I together could convince

19  the other two members.

20    Q. So the time frame from the time that Mr. Reppas

21  came in to talk to you which I believe you said was Monday

22  or Tuesday --

23    A. It was a Wednesday.

---

**131**

1    Q. It was a Wednesday?

2    A. Mm-hmm.

3    Q. Until the following Tuesday when they voted, is

4  that what you're saying?

5    A. Mm-hmm.

6        MR. TEHAN: Yes or no, sir?

7    A. Yes.

8    Q. That no one discussed with you, the Board of

9  Selectmen didn't discuss with you the, any member other

10  than Mr. Reppas discuss with you this, the problems the

11  assessors were having, the misgivings about the

12  refinancing?

13    A. No, when Mr. Reppas came to see me on that

14  Wednesday, I spoke with the two other members of the Board

15  of Selectmen. I believe one had come in to sign some

16  papers and perhaps it was both of them, maybe I caught

17  both of them when they came in to sign papers, but I said

18  "Arthur is having misgivings and he may not, you know, he

19  wants to revisit the idea of whether we make the ambulance

20  fund change," and both of them told me no, we need to do

21  it, the ambulance is a mess, we're sticking with what we

22  said. Well, first agreement did, but on that Tuesday

23  night Mr. Andrews changed his vote, so.

---

**132**

1    Q. Did he give any rationale for changing his vote?

2    A. Not that I remember.

3    Q. After Miss Littlewood was suspended, did she in

4  fact write a letter to the Select Board requesting to be

5  put on the agenda regarding her suspension?

6    A. Yes, I think she did and they, the response was

7  that it needs to go to the Human Resources Board.

8    Q. And do you know when they sent that response to

9  her?

10    A. Not without, you know, looking at the exhibits.

11  It was very timely. I mean we acted, you know, she was

12  put on as soon as they had another meeting.

13    Q. The Human Resources Board?

14    A. The Human Resources Board.

15    Q. But you testified that you were the one who told

16  her she had to go to the Human Resources Board?

17    A. Well, a lot of times when the Board of Selectmen

18  directs something, yes, they direct the town administrator

19  answer, make a response, almost always.

20    Q. So you're the one that told her but at the bequest

21  of the Town, I mean the Board of Selectmen?

22    A. (Nods head.)

23        MR. TEHAN: Is that correct, sir?

---



# TOWN OF ORANGE

**Michael J. Racicot, Town Administrator**

6 Prospect Street, Orange, MA 01364



Racicot
Exhibit No. ___1___

10/15/04          KB

# MEMORANDUM

DATE:        October 13, 2000

TO:          Shari Littlewood, Assessor's Clerk

FROM:        Michael J. Racicot, Town Administrator

RE:          Suspension for Insubordination, Failure to Perform Duties

_____

You are being suspended for three days, beginning October 17, 2000, for your failure to complete essential paperwork after a direct order from your supervisor to do so.

You were given sufficient time to complete the task but deliberately delayed completion despite direct instructions. This type of behavior is completely unacceptable in any organization. Your actions had a direct negative effect on the finances of the Town of Orange.

Future failure to follow through in the performance of your duties may result in discipline, up to and including termination.

cc:     Human Resources Board
        Board of Selectmen



Exhibit No. 2
10/15/04    KB

<u>Supervision of the Clerk to the Assessors</u> — Jan. 29, 01

The job description for the Clerk to the Assessors states that the supervision of this position is done by both the Board of Assessors and the Board of Selectmen.

This supervision will take place as follows:

The Board of Assessors delineates the work it requires of the Clerk and the Work Responsibilities.

The Board of Selectmen (in the person of the Town Administrator) supervises Office Related Procedures such as but not limited to: ① office hours; ② customer service; ③ the physical operation of the office; ④ staff relations

If there is differing opinion as to the completion of work assigned by the Board of Assessors or work concerned with Office Related Procedures assigned by the Board of Selectmen, the two supervising entities will confer.

Board of Assessors
verbal approval by
NORMAN BARTLETT

Board of Selectmen

Chairman of the Human Resource Board



*Caroline Carrithers*
*Attorney at Law*

Post Office Box 2236
Amherst, Massachusetts 01004-2236

Telephone: (413) 548-4911
FAX: (413) 548-4915

August 15, 2001

***CERTIFIED MAIL***
***RETURN RECEIPT REQUESTED***

Michael J. Racicot
Town Administrator
Town of Orange
6 Prospect Street
Orange Massachusetts 01364

Nancy M. Blackmer
Town Clerk
Town of Orange
6 Prospect Street
Orange Massachusetts 01364

Bruce Gabrenas
Chair of the Board of Selectmen
Town of Orange
6 Prospect Street
Orange Massachusetts 01364

**RE:** *Littlewood  v. Racicot*
**M.G.L. CHAPTER 258 DEMAND LETTER**

Dear Town Administrator Racicot, Chair of the Board of Selectmen Gabrenas and Clerk
Blackmer:

This is a formal demand letter sent to you pursuant to the requirements of Massachusetts
General Laws, Chapter 258, Section 4. This claim is made on behalf of Ms Shari Littlewood,
264 West Main Street, Orange, Massachusetts. The following is an accurate summary statement
of incidents which occurred on and subsequent to September 20, 2000.

On October 17, 2000, Ms Littlewood was suspended for three days from her position as
Assessors' Clerk in the Town of Orange by the town administrator, Michael J. Racicot, for
refusing to approve, in her capacity as a Member of the Board of Assessors for the Town of
Orange, an increase in the tax rate for the town. Ms Littlewood believes that Mr. Racicot

suspended her in retaliation for exercising her First Amendment Rights to free speech in opposing his plan to raise the tax revenue at a meeting of the Board of Selectmen. Ms Littlewood further believes that Mr. Racicot retaliated against her rather than the other two male Assessors because she is a woman. The following is a summary statement of the facts which support her claims.

Ms Littlewood is a thirty-two-year-old woman. She has a BA in Business Administration, CPA Curriculum, from the University of Massachusetts, which she received in May 1998. Each year since 1997, she has attended and received a certificate from UMASS Tax School, an update program for Tax Preparers taught by the IRS and the Commonwealth of Massachusetts DOR. In August of 1999, she received her Classification Certification from the Commonwealth of Massachusetts, Division of Local Services, which allows her to assess properties in Massachusetts.

In March 1999, Ms Littlewood was elected to the Board of Assessors for the Town of Orange. At the same time she began filling in as the Assessors' Clerk, a paid position in which she was responsible for implementing and interpreting issues relating to the Board of Assessors. On May 1, 1999, she applied for and was officially hired as the town's Assessors' Clerk.

In September 2000, Mr. Racicot, in his capacity as town administrator, recommended to the Board of Selectmen that they set up a reserve account for the ambulance service. To start the reserve account, Mr. Racicot recommended that the town set aside $166,799 from the operating budget. The Selectmen voted to set aside the requested amount on September 20, 2000.

After review, the Board of Assessors, including Ms Littlewood, refused to approve the Selectmen's vote to allot funds from the general operating fund to cover the reserve account for the ambulance service. The Board refused because it realized that the Selectmen's vote committed the town to raising the town's tax rate, which is highly unethical without an official Town Meeting. In his presentation of his proposal to the Board of Selectmen and the Finance Committee, Mr. Racicot had glossed over the need to raise the tax rate, implying that the allotment he was requesting was an accounting change, which simply required a transfer of funds from one budget line to another.

On October 4, 2000, at a meeting of the Board of Selectmen, Ms Littlewood, in her role as a member of the Board of Assessors, spoke out against Mr. Racicot's proposal, advising the Selectmen that their decision on September 20, 2000, would raise the tax rate seventy-two cents for every one thousand dollars a home is valued. Another member of the Board of Assessors, Steven Adam, reminded the Selectmen that the tax rate had already been increased by more than one dollar and forty cents, the highest increase in the past fifteen years. Both Ms Littlewood's and Mr. Adam's statements were printed in an article which appeared in *The Recorder* on October 5, 2000.

In an attempt to ram his proposal through before the Board of Selectmen had an

opportunity to rescind their vote, Mr. Racicot ordered Ms Littlewood, in her capacity as an 'Assessors' Clerk, to give to him the forms to be sent to the state, certifying the increase in the tax rate. By law, two members of the Board of Assessors, which is responsible for obtaining state certification of an change in the tax rates, must sign any form certifying a tax rate increase. Ms Littlewood had already begun preparation of the forms. However, on October 12, 2000, Arthur Reppas, Chair of the Board of Selectmen, came to her and asked if the forms certifying the increase in the tax rate had been submitted to the state. When Ms Littlewood told him that they had not, he requested that they not be submitted until after the meeting of the Board of Selectmen on October, 18, 2000. Selectman Reppas advised Ms Littlewood that because he was not in favor of a tax rate increase without a town vote, he wanted further discussion of Mr. Racicot's proposal.

On information and belief, Ms Littlewood concluded that Selectman Reppas, who had just left Mr. Racicot's office prior to speaking with her, had also advised Mr. Racicot that he did not want the forms certifying a tax rate increase sent to the state without further discussion by the Board of Selectmen. When Ms Littlewood mentioned Selectman Reppas's request to Mr. Racicot, and reminded him that the Board of Assessors did not approve of the tax rate increase, Mr. Racicot became quite angry, yelling at her that four people (meaning Selectman Reppas and the three members of the Board of Assessors) were not going to hold the Town of Orange hostage. He ordered Ms Littlewood to have the forms on his desk by the end of the day or else.

At 9:00 A.M. on October 13, 2000, Mr. Racicot came into Ms Littlewood's office and told her that he wanted to see her . He then took her out into the elevator lobby in town hall where other people could not hear their conversation. His first words to Ms Littlewood were,"The Board of Assessors has no legal right not to sign the recap sheet (the form certifying the tax rate increase)." Ms Littlewood felt intimidated by his tone of voice and his demeanor. She felt that he had no right to order her to sign the forms because her signature was required as a member of the Board of Assessors, not as the Assessors' Clerk. Ms Littlewood reminded Mr. Racicot that there were two other members of the Board of Assessors (both male) and that if he wanted a member of the Board of Assessors to sign the forms that he had to contact the other members as well. She advised him that she was uncomfortable with the way he was handling this situation and that his ordering her to sign the forms was unfair to her. She then went and got the form off her desk and gave them to him.

Mr. Racicot further humiliated Ms Littlewood in front of her peers at the Financial Team Meeting held at 10:00 A.M. on October 13, 2000. At the meeting, he announced to those present that there was a problem. He then fabricated that the town was going to have to borrow money, and proceeded to talk to the Town Accountant, the Tax Collector, and the Treasurer, manufacturing their concern. He then proceeded to imply that this so-called problem was all Ms Littlewood's fault by saying that, "Now I will turn the floor over to Shari so that she can tell us why we have to borrow." Ms Littlewood told him that this was neither the time nor the place to discuss their conflict over her refusal to sign the state certification forms. His reply was, "I will see YOU after the meeting." He then adjourned the meeting, pointed his finger at Ms

3

Littlewood, and stretching his arm out towards the door to the elevator lobby, repeated, "I WILL
SEE YOU OUT THERE."

At this second meeting in the elevator lobby in town hall, which took place at
approximately 11:00 A.M. on October 13, 2000, Ms Littlewood again told Mr. Racicot that she
was not going to keep doing this, that he needed to contact the other two male members of the
Board of Assessors. She advised him that there was to be a meeting of the Board of Assessors on
October 16, 2000, and that he could come and present his problems there. She further advised
him that he could contact the other two members of the Board of Assessors and attempt to obtain
their approval. Mr. Racicot then said, "So, you are not going to sign." Once again, Ms
Littlewood told him, "No." At that point, he told her, "Well, then you are suspended for three
days." As he spoke, he handed Ms Littlewood an already prepared memorandum of suspension
which he had written before attending the Financial Team meeting.

Ms Littlewood immediately appealed her suspension. She requested Mr. Racicot to delay
the suspension until the Board of Selectmen had an opportunity to hear her appeal, but he
refused. Therefore, she was suspended from work from October 17, 2000 to October 20, 2000.

On the day that Ms Littlewood returned, Mr. Racicot demanded that she meet with him.
At the meeting, he advised her that they should start again and forget the past. When Ms
Littlewood advised him that it was not over for her, that she did not feel that the matter had been
settled and that she was still very upset, he began to degrade at her, asking her if she knew who
he was and threatening to fire her if she did not cooperate with him. Ms Littlewood told him if
he thought she was doing such a lousy job that he should just go ahead and fire her.

After the Board of Assessors advised the Selectmen that their vote did, in fact, commit
the town to a tax increase, the Selectmen voted on October 18, 2000, to rescind their original
vote to allot $166,799 of the general operating fund to set up an account for the operation of the
ambulance service. The Selectmen's rescinding of their vote killed Mr. Racicot's proposal. At
this meeting, Ms Littlewood attempted to raise the issue of her suspension, but the Board refused
to allow her to speak, demanding that she raise the issue with the Human Resource Board..

Ms Littlewood immediately filed a complaint against Mr. Racicot with the Human
Resource Board which first met to discuss her suspension on November 14, 2000. Mr. Racicot
was present, and was allowed to sit at the table with the members of the Human Resource Board,
even though he is not a member. At this meeting, Mr. Racicot claimed that he suspended Ms
Littlewood for "lying and not completing [the paperwork] as told." He denied that he had
suspended her for not signing the tax rate certification. However, he did not explain what she
had lied about or what had not been left uncompleted on the paperwork, other than her signature.
Ms Littlewood contradicted Mr. Racicot, advising the Board that he had, in fact, suspended her
because she had refused to sign the tax rate increase certification. After hearing both Mr. Racicot
and Ms Littlewood, the Human Resource Board suspended further discussion for ten days in
order to clarify procedural questions.

4

On November 20, 2000, the Human Resources Board for the Town of Orange met again to consider Ms Littlewood's appeal of her suspension. At Ms. Littlewood's request, the meeting was open. After considering several alternative punishments, including a one-day suspension, and/or a written warning, the Board voted unanimously to rescind Ms Littlewood's three-day suspension and restore her pay. During the meeting no one criticized Mr. Racicot for his harsh, unjust treatment of Ms Littlewood. To Ms Littlewood's knowledge, Mr. Racicot has never been held accountable by anyone either for his treatment of her or for his unethical attempt to bypass both the Board of Assessors and the Board of Selectmen and raise the tax-rate for the town without their or the town's approval.

During the course of the Human Resources Board Meeting, Ms Littlewood requested to see her personnel file. After discussion, Mr. Pond accompanied Mr. Racicot to get the file. Upon looking through her file, Ms Littlewood discovered that a notice of her three-day suspension, as well as other papers that she had never seen, had been placed in her file without her knowledge.

At no time did Mr. Racicot attempt to contact the two male members of the Board of Assessor, nor did he return their phone calls. At no time did he even request, let alone demand, that they sign the certification forms. He had not retaliated against them in any way for not signing the forms, but he was allowed to do so to Ms Littlewood.

Ms Littlewood accuses Mr. Racicot, as an agent of the Town of Orange, of violating her First Amendment rights to free speech when he retaliated against her for expressing her view, as a member of the Board of Assessors, that the tax rate should not be raised. As a result of this violation, Ms Littlewood has claims against Mr. Racicot pursuant to 42 U.S.C. § 1983 and to Massachusetts Civil Rights Law, as well as M.G.L. Chapter 258. Moreover, she accuses Mr. Racicot, as an agent of the Town of Orange, of unlawful discrimination on the basis of gender in direct violation of various Federal and Massachusetts Civil Rights Statutes, including, but not limited to M.G.L., Chapter 151B and Title VII, as amended. Furthermore, she accuses Mr. Racicot of violation of various Massachusetts common law torts, including, but not limited to, reckless and/or intentional infliction of emotional distress, defamation, breach of public policy, inference with an advantageous relation, and breach of the covenant of good faith and fair dealing.

In addition to the civil rights violation and multiple reckless and/or intentional torts described above, the deprivation of Ms Littlewood's rights was directly and proximately caused by the negligent failure of the Town of Orange to adequately screen, test, train, supervise, investigate, and discipline Mr. Racicot to the extent that custom and practice and acquiescence by supervisory officials resulted in an unconstitutional policy. .

As a direct result of Mr. Racicot's and the Town of Orange's illegal and discriminatory actions, Ms Littlewood suffered, and continues to suffer, severe emotional distress and mental anguish, public embarrassment, degradation and humiliation.

5

In the event that we are unable to resolve this matter by means of an administrative claim, negotiations, and/or mediation, Ms Littlewood will pursue all remedies pursuant to M.G.L. Chapter 258, and also all remedies for the violation of civil rights pursuant to 42 U.S.C., Section 1983, the Declaration of Rights of the Massachusetts Constitution, and M.G.L. Chapter 12, Sections 11H and 11I. Ms Littlewood will also pursue remedies for common law torts, including, not limited to, reckless and/or intentional infliction of emotional distress, defamation, breach of public policy, and breach of the covenant of good faith and fair dealing.

Ms Littlewood makes a claim totaling One Hundred Thousand Dollars ($100,000.00) pursuant to M.G.L. Chapter 258. Although this letter is submitted to you for the purposes of making a formal claim under Chapter 258, I invite you to discuss with me a resolution of all the other potential claims Ms Littlewood has against Mr. Racicot and the Town of Orange.

You are invited to respond to this claim at your earliest convenience. However, if this case is not settled within six (6) months from the date you receive this letter, I will pursue a judicial remedy against Mr. Racicot and the Town of Orange.

Yours truly,

Caroline Carrithers